[Civ. No. 27683.   Second Dist., Div. Three.   June 24, 1965.]

ANNA HILLAR LEONARD, as Administratrix, etc., Plaintiff and Appellant, v. KENNETH A. GALLAGHER et al., Defendants and Respondents.

364

Lascher & Bedworth and Edward L. Lascher for Plaintiff and Appellant.

Litwin & Joseph and Charles S. Litwin for Defendants and Respondents.

KAUS, J.—Plaintiff, the administratrix of the Estate of Petrea Hillar, deceased, sued defendant Kenneth A. Gallagher and Lovina E. Lund on a common count for money loaned by the decedent to defendants in her lifetime in the sum of $5,850, plus interest. The complaint also alleges that Gallagher on June 17, 1961—about seven months before decedent's death—promised to pay that sum to decedent and that he then was acting as agent of Mrs. Lund, his mother.

The evidence disclosed and the court made findings to the effect that Gallagher had borrowed $1,100 from decedent in 1946. He gave her a personal note as evidence of the debt and repaid about $130 in 1949 "to apply to interest." There is really no question that at the time of the transaction decribed below Gallagher's debt was long outlawed. The court found that on July 12, 1960, Gallagher's debt amounted to $970 principal and $645.05 interest.

Gallagher's mother, Mrs. Lund, had also borrowed certain sums from decedent and given a note therefor. The exact

amount of her loans is obscure. In any event the court found, and the finding is not attacked as to the amount, that on July 12, 1960, the amount owed by her, also found to be outlawed, was about $4,000.

On July 12, 1960, Gallagher delivered a document to decedent which is set forth in full herewith: "AGREEMENT FOR ASSIGNMENT OF COMMISSIONS TO: MILT FELD, NEVADA LAND & INVESTMENTS, 5557 OLETA, LONG BEACH, CALIF. THE UNDERSIGNED, KENNETH A. GALLAGHER, UNCONDITIONALLY ASSIGNS A TOTAL OF FIVE THOUSAND EIGHT HUNDRED FIFTY AND NO/ 100 DOLLARS ($5,850.00) TO PETREA HILLAR (MRS. GEORGE HILLAR) OR ANNA HILLAR LEONARD, BOTH ARE NOW RESIDING AT 7327 RUFFNER AVE., VAN NUYS, CALIFORNIA. IT IS UNDERSTOOD THAT PAYMENTS ON THE ABOVE ARE TO BE AT $200.00 PER MONTH, OR MORE AT SUCH TIMES AS ANY OF THE ACCOUNTS DUE KENNETH A. GALLAGHER ARE PAID IN FULL. IN THE EVENT OF PAYMENT IN FULL ALL WILL BE PAID TO ASSIGNEE, AND THE MONTHLY PAYMENT WILL DROP $15.00 ON EACH SUCH ACCOUNT. IT IS FURTHER UNDERSTOOD THAT KENNETH A. GALLAGHER THIS DATE HAS APPROXIMATELY $9,000.00 IN EARNED COMMISSIONS DUE FROM NEVADA LAND AND INVESTMENTS, AND THIS IS RECEIVED ON AN AVERAGE MONTHLY INCOME OF ABOUT $300.00 PER MONTH. THIS ASSIGNMENT IS MADE IN TRIPLICATE. ORIGINAL TO BE HELD BY PETREA HILLAR, OR ANNA HILLAR LEONARD. DUPLICATE TO BE HELD BY MILT FELD. TRIPLICATE HELD BY KENNETH A. GALLAGHER."

In return for the document Gallagher received the two notes and tore them up.

When the document signed on July 12, 1960, was delivered to decedent, Gallagher represented to her that he had certain commissions coming from Mr. Feld, the person to whom it was addressed, that he felt responsible for his mother's inability to pay the outlawed debt and that such was the reason for his signing of the document.

It should be noted that at no time was it claimed below that Gallagher was in bad faith when making the representation concerning the debt of Feld to him and the trial judge specifically stated that there was no question of misrepresentation or fraud before the court. Furthermore, plaintiff in certain proposed findings of fact, which were not signed by the court, did not propose any finding pointing to bad faith, but merely proposed a finding that the debt from Feld to

Gallagher was not absolute, but depended on certain contingencies.

Feld, for personal reasons, refused to make any payments directly to decedent, but made a few periodic payments to Gallagher. Gallagher, in turn, sent two checks totaling $600 payable to the order of plaintiff *or* decedent which were endorsed by both. Each check bore the notation: "commission assignment." The trial court found that Gallagher made these payments "after he had received those amounts as commissions from Milt Feld . . . as the payor of such commissions."

For reasons immaterial to any issue on this appeal Feld then stopped paying Gallagher and decedent received no further payments.

On June 17, 1961, Gallagher mailed a letter to decedent which is the instrument on which the action was brought. It is set forth in full below: "June 17, 1961. Dear Mrs. Hillar: Since I saw you last things have gone from bad to worse on the commissions I had coming from Milt Feld. Darn near all the sales at Imlay have cancelled now as a result of the law suit we had up there. My other deal is in good shape however. I talked to mother last night and she passed on the word that you were quite unhappy about the whole deal we made. Can't blame you. *To put your mind a little at ease I'll go down on record here in stating that I'm not about to leave you holding the bag. The source of where the money comes from is the only question.* I'm leaving for Winnemucca Monday and will be gone at least a week. On my return I'll re-contact you as at that time I'm going to try to arrange to sell at least part of my interest in this new company. That should give enough cash to come darn close to paying you off in full. Best regards. Ken Gallagher." (Italics added.)

No further payments were ever made either by Gallagher or his mother. Thus in spite of the promise to the contrary, decedent was left holding the bag and by this action the administratrix of her estate attempted to resolve the question of "the source of where the money comes from."

The court found: 1. Gallagher acted as the agent of his mother when the document of July 12, 1960, was delivered and payments were made pursuant thereto, but not when he wrote the letter of June 17, 1961; and 2. When the payments totaling $600 were made in August and October 1960 "no application was made by the parties as to whose obligation said payments were to be applied."

Relevant conclusions of law were that the document of July 12, 1960, was "an assignment of commissions merely designating the source of funds from which payments were to be made," that the parties "understood payments pursuant thereto to be applied to the indebtedness of both defendants, but no specific agreement as to the method of application was made. The parties by agreement commingled the indebtedness of the two defendants," that the said document of July 12, 1960, was "not a new promise to pay" nor was it "an acknowledgement of indebtedness which would start the statute of litmitations running anew." The court also concluded that the letter of June 17, 1961, was an acknowledgment by Gallagher "to make good any indebtedness which he was legally obligated to pay, except for the bar of the Statute of Limitations," that as to his own indebtedness of $970 principal and $645.05 interest, it "started the statute of limitations running anew," that Gallagher, on June 17, 1961, when the letter was written, was under no legal obligation to pay his mother's indebtedness and that the payments following the execution of the July 12, 1960, document, totaling $600, should be applied to the indebtedness of the mother "since her indebtedness which is barred by the statute of limitations is the more tenuous."

Judgment was given in favor of plaintiff against Gallagher in the amount of $1,615.05 and in favor of Gallagher's mother, Mrs. Lund, against the plaintiff. Only plaintiff appeals.

Plaintiff attacks the judgment on various grounds. Her first point is that the paper delivered by Gallagher to the decedent on July 12, 1960, which we have so far called a "document" is in fact not merely an assignment of certain funds due to Gallagher from Fcld but an unqualified promise to pay.[1]

---

[1]At this point we do not stop to ask what consideration Gallagher received or the decedent gave for his promise to pay his mother's outlawed debt. Perhaps, by implication, decedent agreed to forbear while payments from Feld were being made. (*MacDonald* v. *Rosenfeld,* 83 Cal.App.2d 221, 237 [188 P.2d 519].) Nor, since Gallagher has not appealed, is it necessary to decide whether or not the transaction of July 12, 1960, was a novation in which Gallagher's assignment of the commissions to pay his mother's debt was the consideration for a discharge of his own debt, except to the extent of the commissions. (Civ. Code, § 1531.) The trial court apparently thought it was merely an accord. (Civ. Code, § 1521.) Plaintiff apparently raises the proper interpretation of the instrument of July 12, 1960, not for the purpose of making it the basis of recovery, but to show that when Gallagher wrote the letter of June 17, 1961, which the court concluded was an acknowledgment "to make good any indebtedness which he was legally obligated to pay, except for the bar of the Statute of Limitation" Gallagher was under an enforceable legal obligation to pay both his and his mother's debts.

In support of this contention plaintiff cites many principles and authorities to the effect that the instrument should be construed so as to make it lawful, operative and capable of being carried into effect, that it should be given the construction placed upon it by the parties, that it should be construed against Gallagher, the draftsman, and that Gallagher should not be permitted to profit "from his own wrong."

Taking up the last contention first, we do not see where Gallagher committed any legal wrong. When the document was delivered to decedent he was in no way responsible for his mother's debt. Although the moral obligation of his mother to pay the outlawed debt was still alive, it is no reason for enlarging Gallagher's beyond what it appears to be. Plaintiff argues as if Gallagher had made fraudulent representations concerning the debt from Feld. As has been pointed out such a theory was neither pleaded nor proved. Nor did plaintiff purport to proceed against him on any of the implied warranties of an assignor, clouded though the subject may be in California. (See Cal.Jur.2d "Assignments" § 62.)

Plaintiff also, by way of analogy, likens the instrument to a check and asks whether she would have been denied relief, had the check been dishonored for insufficient funds. ▮ The trouble with that argument is that a check, unlike an assignment, carries the general personal credit of the drawer and not only the credit of a particular fund. If the check is not honored, the drawer is personally liable. (Civ. Code, § 3142; *Charlotte Guyer & Associates* v. *Franklin Factors,* 211 Cal. App.2d 690, 697 [27 Cal.Rptr. 575]; cf. Civ. Code, § 3265e.)

Turning to the various canons of construction invoked by appellant, they are of course only applicable if there is anything to construe or interpret.

▮ We cannot, under the guise of interpretation or construction, make the instrument of July 12, 1960, something which it obviously is not. It is entitled: "Agreement For Assignment of Commissions." It is addressed to Mr. Feld. The operative language "unconditionally assigns a total of $5,850.00" to decedent or plaintiff. This language is then followed by a paragraph which, it must be admitted, is far from clear. It contains a recital that at that time Gallagher had about $9,000 in earned commissions due from the obligor, which he was receiving at an average monthly rate of about $300 per month. Just what is meant by the first two sentences of the second paragraph[2] is debatable. Was Feld supposed to

---

[2]"It is understood that payments on the above are to be at $200.00 per month, or more at such times as any of the accounts due Kenneth A.

pay $200 per month to the assignees and $100 to Gallagher? Just what was to be the effect in case any of Gallagher's accounts were paid in full? We believe however that speculations concerning the meaning of that language are beside the point, because, whatever was to be the size of the monthly installments, there is nothing in the instrument which even hints at a promise from Gallagher to the assignees to pay anything, in installments or otherwise, if the source of the funds assigned, the commissions, should not pay out.

Parol evidence concerning the meaning of the instrument was received without objection. Plaintiff testified, in answer to a question asking for "any conversation as to where these monies were coming from or to come from" as follows: "No. [Gallagher] explained that he did have money coming from [Feld] . . . As far as I know it was Mr. Feld or the company he worked for, and quite a few commissions. And that's why he could make it out as he did . . . that this money was to come from Mr. Feld." Q. ". . . He told you about these commissions coming from Mr. Feld or Mrs. [sic] Feld's company?" A. "Yes." Q. "And that the money would then be paid over by Mr. Feld?" A. "Yes."

If plaintiff's testimony still leaves room for doubt, Gallagher came through unequivocally. He testified that when plaintiff asked him what would happen if the commissions did not pay out, he answered: "Well, you are just left out in the cold. And she understood this at the time she got it."

Plaintiff stresses the fact that when asked for his reason for drawing up the instrument, Gallagher said that decedent had been pressuring his mother for payment of her obligation and he intended to make a "long-term gift to my mother to relieve an obligation that she had." There is nothing in Gallagher's statement that he intended to make a gift to his mother which rebels against the clear language of the instrument. To be sure, had he personally assumed unlimited liability for his mother's obligations, his generosity would have been greater, but he did not testify that he wanted to become as openhanded as the law permitted him to be. It must not be forgotten that there is no hint in the record before us that as of July 12, 1960, Gallagher was in any way legally or morally obligated for his mother's debts. ▉ In assigning to plaintiff such portion of his expected commissions as would

Gallagher are paid in full. In the event of payment in full all will be paid to assignee, and the monthly payment will drop $15.00 on each such account.''

have satisfied the mother's debt, he was, indeed, ''making a gift.''

■ We therefore hold that the instrument is clear and unambiguous and that it was just what it appears to be, an assignment; but even if extrinsic evidence can explain any ambiguities which are not apparent to us, it clearly points to an assignment of a special fund. Any finding to the contrary would be erroneous. (Cf. *Parsons* v. *Bristol Development Co.*, 62 Cal.2d 861 [44 Cal.Rptr. 767, 402 P.2d 839].)

■ Plaintiff also assigns as error the finding that the assignment was not a new promise to pay or an acknowledgment, from which a promise could be implied, which would have revived the statute of limitations. (Code Civ. Proc., § 360.) The point is immaterial. Conceding for the sake of argument that it was an acknowledgment or promise on the part of Gallagher, not only to pay his debt, but also that of his mother, the promise or acknowledgment was obviously conditional, the condition being the existence of the fund, that is to say Feld's debt to Gallagher. (*Morehouse* v. *Morehouse,* 140 Cal. 88 [73 P. 738].) In *Snyder* v. *Dederichs,* 39 Cal. App. 628 [179 P. 535], the new promise was as follows: ''Your letter received in regard to the money I did get from Willard . . . Still if I would make money, and see my way through, I would send you some money, and I will the first chance that I make something I will help you [*sic*] . . . . I loaned a party some money which he promised sure by next month I would get $300 of it. Should I succeed in this I will send you sure $150 or $200 of this. At the present time I cannot do anything on account I have not it. . . .'' The court said: ''Plaintiff's right of action must be measured by the promise made, and, since it is not alleged nor shown that the condition upon which the promise was made was fulfilled, it cannot be claimed that such promise extended the time to sue upon the original obligation.'' (*Ibid.,* pp. 629-630.)

It is thus apparent that any hypothetical error in failing to find that the instrument of July 12, 1960, was a new promise or acknowledgment is immaterial, there being neither pleading nor proof that the fund on the existence of which it depended was available to meet the obligation. At this point it is perhaps not too old-fashioned to note that the action was expressly based on the letter of June 17, 1961, and not on the instrument of July 12, 1960. (See *Rodgers* v. *Byers,* 127 Cal. 528, 530 [60 P. 42].)

■ Thus the answer to plaintiff's first two points is the

same: we cannot find that the trial court's finding that the "assignment" was an assignment is wrong, and since there is no showing of any kind that the special fund to which it related failed to materialize because of any voluntary action on Gallagher's part, plaintiff cannot look to any other asset of his. (Cf. *Zogarts* v. *Smith,* 86 Cal.App.2d 165, 172-173 [104 P.2d 143].)

Thirdly, plaintiff contends that the letter of June 17, 1961, constituted an acknowledgment of the entire sum originally owed by Gallagher and his mother and that the trial court erred in finding that he did not act as his mother's agent at the time.

Concerning the last point, plaintiff appears to concede that there was no direct evidence of agency of Gallagher for his mother shown as of June 1961, but claims that the court, having found him to be her agent when the assignment was delivered and payments made pursuant thereto, could not find that the agency had terminated thereafter, without some evidence to that effect. (*Gudger* v. *Manton,* 21 Cal.2d 537, 552 [134 P.2d 217].)

There are at least two answers to the point: 1. Whatever may have been the basis for the finding that Gallagher was his mother's agent in 1960, it was not in writing. ██ Any acknowledgment or promise within Code of Civil Procedure, section 360 must be in writing and so must the agent's authority. (Civ. Code, § 2309.) 2. It appears to be the law in California, compelled by the express language of Civil Code, section 2337, that an instrument within the scope of the agent's authority by which he intends to bind his principal, does bind him if such intent is plainly inferable from the instrument itself. ██ There is nothing in the letter of June 17, 1961, from which one could infer that Gallagher purported to act on behalf of his mother.

Turning to the contention that by the letter of June 17, 1961, Gallagher acknowledged not only his original debt, but also his mother's, the problem is this: assuming that this is what he intended to do, what was the consideration for the promise? As of then, he was not liable for his mother's obligation, except to the extent of the assignment. There is no evidence of any promissory estoppel, no compelling evidence that any forbearance was expressly or impliedly bargained for. The evidence does support a finding that the letter was written because plaintiff was pressing defendants to perform. True, no suit was filed for several months and actual

forbearance is evidence of an agreement to forbear—*Levine* v. *Tobin,* 210 Cal.App.2d 67, 69 [26 Cal.Rptr. 273]; *E-P Constructors, Inc.* v. *Peterson Tractor Co.,* 192 Cal.App.2d 518, 525 [13 Cal.Rptr. 569]—but the trial judge was not required to draw that inference from the vague evidence on the point.

If there is to be any consideration for the promise to pay the mother's debt, it must, of necessity, arise out of Gallagher's moral obligation to pay his own debt. We have found no case precisely in point. Respondents' brief is not too helpful in this connection, because it is their argument that the letter of June 17, 1961, was not even an acknowledgment of Gallagher's own antecedent debt and we are asked by Gallagher to reverse plaintiff's limited judgment in her favor against him. This we cannot do on this appeal. (*Briggs* v. *Nilson,* 226 Cal. App.2d 342, 349 [38 Cal.Rptr. 68].)

■ Most certainly Gallagher's own outlawed debt was a sufficient "past" or "moral" consideration for any promise to pay it and nothing more. Plaintiff, however, would have us go further and make that debt support, in addition, a promise —or an acknowledgment from which a promise can be implied —to pay his mother's debt.

■ There are several answers to this contention: 1. The very wording of Code of Civil Procedure, section 360 militates against such a possibility: "No acknowledgment or promise is sufficient evidence of a new or continuing contract . . . unless the same is contained in some writing, signed *by the party to be charged thereby. . . .*" (Italics added.) Thus in *Sullivan* v. *Sullivan,* 99 Cal. 187 [33 P. 862], a widow had promised to pay the deceased husband's outlawed obligation to his brother who had loaned him money to purchase a policy of life insurance, of which the widow was the beneficiary. Holding that there was no consideration the court said: "The defendant was under no kind of obligation to pay a debt of her deceased husband for which she had never before been liable, either as principal or surety, even though such debt had not been barred by the statute of limitation [citations omitted]; surely not after the debt had been barred (*Rosenberg* v. *Ford,* 85 Cal. 610 [24 P. 779]); and this is all that need be decided in this case." (*Ibid.,* page 193.)

■ 2. Indeed it would be incongruous if the law were otherwise because it is well established that the existing debt of a third person is insufficient consideration, regardless of family ties. (*Royer* v. *Kelley,* 174 Cal. 70 [161 P. 1148]; *Lagomarsino* v. *Giannini,* 146 Cal. 545 [80 P. 698].) In *Tiffany*

& Co. v. Spreckels, 202 Cal. 778 [262 P. 742], a husband promised to pay his wife's then existing obligation. No other consideration was shown. Finding that neither the wife nor the husband had received anything and that the creditor had parted with nothing, the promise was held to be unenforceable.

3. It appears to be the universal rule throughout the United States that past consideration will not support a promise which is in excess of the promisor's existing debt or duty (1A Corbin on Contracts, § 212.)[3] Thus in Herbert v. Lankershim, 9 Cal.2d 409, 478 [71 P.2d 220], it was held that prior services rendered at the request of a decedent would not support a promise to pay money therefor in excess of the reasonable value of the services.

In the light of these accepted principles, it would be strange if a promise to pay something in addition to an enforceable debt of the promisor, insufficient for lack of consideration, should suddenly become good, if the enforceable debt of the promisor becomes outlawed and the additional promise is the payment of another's outlawed debt.

Although the statute is not discussed by the parties, we should not close our discussion of this issue without reference to Civil Code, section 1606 which reads as follows: "An existing legal obligation resting upon the promisor, or a moral obligation originating in some benefit conferred upon the promisor, or prejudice suffered by the promisee, is also a good consideration for a promise, to an extent corresponding with the extent of the obligation, but no further or otherwise."

On the face of section 1606 it is conceivably subject to the interpretation that a moral consideration, resting alone on "prejudice suffered by the promisee," not preceded by any legal obligation of the promisor, is a sufficient consideration. Cognizance must be taken of the fact that our Supreme Court in recent years has found extended scope for the application of section 1606. (Wilson v. Wilson, 54 Cal.2d 264 [5 Cal.Rptr. 317, 352 P.2d 725]; Desny v. Wilder, 46 Cal.2d 715 [299 P.2d 257].) We have carefully analyzed every decision interpreting section 1606 and except for one

---

[3] "The new promise must be co-extensive with the existing debt or other duty, or must be to render a performance that is wholly and exactly included within that debt or duty. Thus an existing overdue debt of $100 is a sufficient basis to sustain the debtor's promise to pay $100 to the creditor, or to pay $80 or any other sum less than $100; but it is not a sufficient basis for a promise to pay $101." Ibid., page 282.

obviously inadvertent statement in *Haase* v. *Cardoza,* 165 Cal.App.2d 35 [331 P.2d 419],[4] find that none of them lend support to a suggestion that, in cases involving ''past consideration,'' absent estoppel, a moral obligation resting in prejudice to the promisee alone, without an antecedent legal obligation owed by the promisor, is sufficient.

The leading case construing section 1606 is, of course, *Estate of McConnell,* 6 Cal.2d 493 [58 P.2d 639]. There the Supreme Court reiterated the settled rule, that in California a moral consideration is sufficient to support an express promise only where an enforceable obligation has once existed. (*Ibid.,* p. 498.) Among the cases cited are several, such as *Sullivan* v. *Sullivan,* 99 Cal. 187 [33 P. 862] and *Royer* v. *Kelly,* 174 Cal. 70 [161 P. 1148] where undoubtedly there once was an enforceable duty owed by someone else. If the court had meant to say that an antecedent legally enforceable obligation of the promisor was a prerequisite only where the new promise is to discharge that very obligation, we would not expect it to rely on cases where the new promise was to discharge a once enforceable obligation of a third person.

Therefore we cannot hold that Gallagher's mother's former existing debt supported his promise to pay it. Indeed such an interpretation of section 1606 would result in an absurd state of the law. ▮ It is well established that the promise of a surety, made after the principal debtor has incurred his obligation, is invalid without a new consideration. (46 Cal. Jur.2d, Suretyship and Guaranty, § 22.) Should the requirement of a new consideration be dropped when the principal debtor's obligation becomes outlawed?

---

[4]In that case the plaintiff was nonsuited and the judgment affirmed on the following showing: In 1951 defendant and her husband put all of their property into an *inter vivos* trust, survivor take all. Later the husband made a will leaving plaintiff $2,500. There being nothing in his estate, the gift lapsed when the husband died. Defendant then voluntarily gave plaintiff $2,500 from her own funds. Some time later defendant told plaintiff that the husband had ''left'' her $10,000 which she had not given plaintiff. She promised to pay her $50 per month which she proceeded to do for eight months. Finding that there was no consideration, in spite of section 1606, the court said among other things: ''Appellant assumes that the mere statement made by respondent to the effect that respondent's husband had asked her to give the $10,000 was an acknowledgment of an obligation and that, therefore, despite the lack of evidence of any obligation on the part of either the respondent *or her husband,* and the admissions of the appellant herself that no preexisting indebtedness existed, respondent's mere statement created a consideration where none prior thereto existed. We feel that there is no merit in this contention.'' *Ibid.,* page 37 (italics added). We cannot find that the italicized words which were quite unnecessary to the decision in the case, there being no obligation on the part of the husband, changed the law.

Lastly—and very much so, since plaintiff's counsel admits that the point did not occur to him until after the opening brief in this court was filed—plaintiff contends that the finding that on July 12, 1960, "more than four (4) years had elapsed on the obligations of said Defendants to said decedent" and the conclusion drawn therefrom that "each and all of the obligations of the two defendants were on July 12, 1960, barred by the Statute of Limitations" were not supported by the evidence, because there was no proof as to the time when the loans by decedent accrued.

The evidence from plaintiff was that she did not remember the exact dates or amounts of the loans, but that she had canceled checks showing the dates, none later than 1950. She also testified to the conversation in connection with the assignment of commissions. At that time Gallagher stated at least once that the two notes were outlawed. Although given an opportunity to state the entire conversation she did not say that either she or her mother protested Gallagher's statement. Gallagher testified concerning his personal loans that he borrowed money in 1946 for which he gave a note. Without objection he said that at the meeting when the assignment was delivered, plaintiff and her mother being both present, everybody agreed that his mother's note had "run through the statute of limitations."

There is no evidence that these loans and notes had any time fixed for payment. The law is therefore clear that they were payable on demand. (Civ. Code, § 1657.)

The finding that the debts were outlawed is amply supported by evidence.

The judgment is affirmed.

Ford, J., concurred.

SHINN, P. J.—I dissent.

The fact that the debts were outlawed is beside the point. The question is whether Gallagher assumed his mother's debt to Mrs. Hillar unconditionally, or limited his liability to making payments out of commissions he would receive. I think a proper interpretation of the agreement must be controlled by the intentions and understanding of the parties at the time Mrs. Hillar surrendered the notes of Mrs. Lund. Gallagher testified by deposition that his purpose was to save his mother from worry and annoyance but, be that as it may, the consideration for surrender of the notes was his agreement

to pay his mother's debt and the detriment suffered by Mrs. Hillar in releasing Mrs. Lund from her obligation. That he did assume and agree to pay the debt cannot be questioned. He was to pay it in full at the rate of $200 or more per month from his own funds, but the agreement does not, independently of the understanding of the parties, answer the question whether the understanding was that Mrs. Hillar would receive no more than a share of the commission Gallagher collected. Thus we come to the question whether the debt was payable only out of a special fund, as Gallagher contends.

The transaction under review cannot be compared to the common situation in which an outlawed debt is acknowledged by a mere writing without a new consideration.

It is not a question of the revival of a debt but whether a debt of honor was wiped out by an empty promise. Here there were existing debts which were neither conditional nor uncertain as to amount. They were combined in a new promise. Gallagher entered into a new agreement by which he transferred property which was expected to provide funds for payment of the debt.

When Gallagher says the intent of the agreement was to limit the rights of Mrs. Hillar to receipt of a share of the commissions he would collect, it is to say that the agreed debt of $5,850 was satisfied by the mere execution of the assignment, regardless of the amount to be realized under it, and even if it produced nothing. I cannot agree. It does not appear as a matter of law and has not been decided as a question of fact.

The basic question for the trial court was whether the assignment, itself, satisfied the debt, in this sense, or was given merely as security. Since, as to this question the agreement is ambiguous and furnishes no satisfactory answer, it was necessary for the court to find, as a fact, whether it was the intention of the parties that the assignment was given and accepted as fulfillment of Gallagher's obligation, or merely as security. There was evidence, consisting of the depositions of Mrs. Leonard and Gallagher, which shed some light upon the intentions of Gallagher, at least, since he testified that he told Mrs. Leonard, when the assignment was executed, that if the commissions failed to pay out she would be left out in the cold. This was merely a circumstance to be considered in determining whether the assignment was given and accepted as payment of the debt in full, or only as security. A correct decision could only have been based upon what the court

found to have been the intentions and understandings of the parties. The court made no finding upon this crucial issue. And it is impossible to determine from the findings and the judgment what meaning and effect the court gave to the writings, or in other words, what were the intentions and understandings of Gallagher and Mrs. Hillar.

From the time Gallagher assumed his mother's debt there was a single, indivisible debt of $5,850. This was the subject of the agreement and also of the letter.

The court rendered judgment against Gallagher for a part of the debt. This implies that the court found that the rights of Mrs. Hillar were not limited to a share of the commissions received by Gallagher or, in other words, the debt was not paid by the assignment. Upon the other hand, in the court's view, the share of the debt originally owed by Mrs. Lund no longer existed. This implies a finding either that that part of the debt originally owed by Mrs. Lund had been satisfied by the execution of the agreement and the payment of $600, or that Gallagher had never assumed it. These conflicting findings are irreconcilable, illogical and fatally inconsistent. Whether the court gave any consideration to the extrinsic evidence, we do not know, but in any event, the judgment has no sound basis in the findings, express or implied. The nearest the court came to expressing its view of the understanding of the parties as to the meaning and effect of the agreement was the conclusion that the agreement of July 12, 1960, was "an assignment of commissions merely designating the source of funds from which payments were to be made," which is not consistent with the view that assignment, itself, was payment of the debt, regardless of the amount of money actually received.

Certainly it does not appear, as a matter of law, that Gallagher's obligation went no further than the payment of a share of what he might receive of his commissions. He drew the agreement, and it was therefore to be interpreted in favor of Mrs. Hillar. It was to be interpreted in favor of honesty and fair dealing. It is my understanding that the law leans that way. I do not believe Gallagher intended to accomplish cancellation of the notes by selling Mrs. Hillar a "pig in a poke." Mrs. Hillar could not have expected any sharp practice. After all, Gallagher and his mother were friends to whom she had loaned money in their adversity, and the fact that Gallagher was making money when he made

the agreement must have assured her that her debt would be paid in full.

The debt was to be paid at $200 or more per month, not by Feld in recognition of Mrs. Hillar's interest in the commissions, but by Gallagher. It is said there is no provision in the agreement that Gallagher would pay more than a share of the commissions he would receive. True. But why should there have been? The debt of $5,850 was acknowledged. The significant fact is that there is no provision that his obligation was limited to a portion of what he would receive. If that had been the agreement, it should have been so stated.

Gallagher's letter is the best evidence of his intentions at the time he made the agreement. There was nothing before the court to indicate that Gallagher had an intention to obtain cancellation of the notes without paying the debt. If his letter was a promise to pay part of the debt, as the court found, it was a promise to pay all of it. If he owed any part of it he owed all of it. In assuring Mrs. Hillar he would not leave her "holding the bag" he was speaking of "the whole deal we made," and not merely a part of it. At no time did he deny his liability for his mother's share of the entire indebtedness. As against the claims of Mrs. Hillar, he could not escape his liability by a plea that the assumption of his mother's debt was without consideration. It was the assumption of that debt that had enabled him to obtain cancellation of her notes. He could not go back on his promise.

In view of the conflicting implied findings and the failure of the court to find facts which would furnish support for the judgment, the case should be retried.

A finding whether the parties intended and understood the assignment was made in satisfaction of the debt, or any part of it, regardless of the sums paid in money, or was given only as security, will furnish a guide to other essential findings.

I would reverse the judgment.

A petition for a rehearing was denied July 20, 1965, and the opinion was modified to read as printed above. Shinn, P. J., was of the opinion that the petition should be granted. Appellant's petition for a hearing by the Supreme Court was denied August 18, 1965.