*1242
 
 Opinion
 

 SILLS, P. J.
 

 As someone once said, if you build it they will come. And by the same token, if you make a baseball card that can’t be counterfeited, they will buy it. Which brings us to the case at hand.
 

 In 1988 the Upper Deck Company was a rookie baseball card company with an idea for a better baseball card: one that had a hologram on it. Holograms protect credit cards from counterfeiting, and the promoters of the company thought they could protect baseball cards as well. By the 1990’s the Upper Deck would become a major corporation whose value was at least a quarter of a billion dollars. Collecting baseball cards, like baseball itself, is big business.
 
 [1]
 

 But the outlook wasn’t brilliant for the Upper Deck back in the summer of 1988. It lacked the funds for a $100,000 deposit it needed to buy some special paper by August 1, and without that deposit its contract with the major league baseball players association would have been jeopardized.
 

 The Upper Deck’s corporate attorney, Anthony J. Passante, Jr., then came through in the clutch. Passante found the money from the brother of his law partner, and, on the morning of July 29, had it wired to a company controlled by one of the directors. That evening, the directors of the company accepted the loan and, in gratitude, agreed among themselves that the corporate attorney should have 3 percent of the firm’s stock. The rest is history. Instead of striking out, the Upper Deck struck it rich.
 

 At this point, if we may be forgiven the mixed metaphor, we must change gears. No good deed goes unpunished. Anthony Passante never sought to collect the inchoate gift of stock, and later, the company just outright reneged on its promise. Passante sued for breach of oral contract, and the jury awarded him close to $33 million—the value of 3 percent of the Upper Deck at the time of trial in 1993.
 

 The trial judge, however, granted a judgment notwithstanding the verdict, largely because he concluded that Passante had violated his ethical duty as a lawyer to his client. There was no dispute that Passante did not tell the board that it might want to consult with another lawyer before it made its promise. Nor did Passante advise the board of the complications which might arise from his being given 3 percent of the stock.
 

 
 *1243
 
 The board had a clear moral obligation to honor its promise to Passante. He had, as the baseball cliché goes, stepped up to the plate and homered on the Upper Deck’s behalf. And if this court could enforce such moral obligations, we would advise the company even yet to pay something in honor of its promise.
 

 But the trial judge was right. If the promise was
 
 bargained for,
 
 it was obtained in violation of Passante’s ethical obligations as an attorney. If, on the other hand, it was not bargained for—as the record here clearly shows—it was gratuitous. It was therefore legally unenforceable, even though it might'have moral force. We must therefore, with perhaps a degree of reluctance, affirm the judgment of the trial court.
 

 Facts and Procedural History
 

 The Upper Deck Company was formed in March 1988 to produce baseball cards with holograms. The initial directors were Paul Sumner, William Hemrick, Boris Korbel, Richard P. McWilliam, Angels’ pitcher DeWayne Buice and Anthony Passante. Passante, who was already the personal attorney for Korbel and McWilliam, was appointed corporate attorney and secretary. McWilliam, an accountant with contacts to a number of investors, had the responsibility of obtaining start-up financing for the company. Passante made no investment in the company and owned no stock.
 

 Upper Deck needed $100,000 to put on deposit with an Italian paper company by August 1, 1988, so the paper would be available for the inaugural run of baseball cards planned for December. Without the paper, the company risked losing its license with major league baseball.
 
 [2]
 
 However, as of July 26, 1988, the company had not obtained financing. To make matters worse, McWilliam was demanding more stock in return for the financing he was supposed to obtain. Board members instructed Passante to demand the return of McWilliam’s 11 percent stock if he would not change his demands.
 

 When Passante found out that McWilliam would not be coming up with the money, he told his law partner, Andy Prendiville that “there was really no hope for the company to make it.’’
 
 [3]
 
 Prendiville asked Passante if he should talk to his brother, who was a doctor and might be able to make a
 
 *1244
 
 loan of $100,000. Passante told Prendiville to call his brother, who said that he “was in a position to loan the money and would do so.”
 
 [4]
 
 Both Passante and Prendiville spoke to Korbel concerning the availability of “those funds.” They told Korbel “that the funds were available.”
 

 Korbel then requested that Passante come to a special board meeting to be held on the evening of July 29, 1988, “in order to talk to the other two shareholders about that loan.” Korbel said he wanted the other shareholders to be a party to the loan. And, because the shareholders would be guaranteeing the repayment of the funds, Korbel “wanted to make sure that he had the agreement of his co-shareholders for that type of an arrangement.”
 

 Dr. Kevin Prendiville wired $100,000 to an account controlled by Korbel just a little after 11 a.m. on July 29, 1988, though Passante still understood that if the board did not approve the loan “it wasn’t going to be made.”
 

 At the board meeting that evening, Passante told the assembled board members (assembled without notice to McWilliam) “about the availability of the funds.” He asked them “if they would be interested in obtaining the money from Dr. Prendiville.” The board members agreed.
 

 The board members were “all quite excited about the availability of those funds.” Korbel “brought up” the idea that the board should consider giving Passante some ownership interest if he got the loan, and Hemrick said, “Look, if you can get that money for us then I think you’re entitled to three percent of the company.” There was “general agreement” among the board members “that that would be the case.” Passante said, “Okay. We’ll do the loan,” and then went back to his office.
 

 Passante drafted a note which did not have an interest rate on it. However, at Korbel’s insistence, an extra $10,000 was paid to Dr. Prendiville for the 90-day loan. The Upper Deck made its deposit.
 

 The day after the deadline, the board members were “quite happy people.” At a meeting held that day, the board members discussed how McWilliam’s 11 percent would be divided; “it was determined” that Passante would receive 3 percent from McWilliam’s 11 percent, and Korbel would receive the 8 percent balance.
 

 Passante’s 3 percent, however, was “to be held by Boris Korbel.” The idea was that Korbel would hold Passante’s interest in the company until McWilliam returned his stock certificate, and, when a new investor was brought in and new certificates were issued, Passante would receive his stock.
 

 
 *1245
 
 But the Upper Deck still needed financing, and, after an unsuccessful attempt to enlist a New York firm, Korbel told Passante that maybe McWilliam should be brought back into the company after all. Passante told Korbel that he “should do whatever he thought necessary to make the company go forward.”
 

 What Korbel thought necessary was to contact McWilliam. On August 31, 1988, Korbel told Passante about Korbel’s conversation with McWilliam. McWilliam, it seemed, was “extremely upset” at Passante “because of what had occurred at the end of July.” Accordingly, McWilliam would only “invest in Upper Deck” on the condition that Passante “not participate as an owner of the company.” Korbel told Passante that “in order to get the company going” Korbel would hold Passante’s 3 percent for him and “we wouldn’t tell Mr. McWilliam or any of the other shareholders about this interest.” After McWilliam “cool[ed] off’ and everything was “smooth again,” Korbel would discuss Passante’s 3 percent interest and either “get a stock certificate representing that interest from the corporation,” or Korbel would at least make sure Passante “obtained the benefit of that three percent through him” by way of profit distributions from the company.
 

 In early fall McWilliam came back into the company; McWilliam soon brought in Richard Kughn, a Chicago investor. As a result, the shares of the company were redistributed, leaving Korbel, McWilliam and Kughn each with 26 percent. After Kughn made his investment, Passante was fired as corporate attorney because Kughn wanted the company represented by a large law firm.
 

 In 1988 and early 1989, Korbel told Passante that he need not be concerned about the 3 percent—that Korbel “had it” and he “would take care of it” for Passante. In November 1990, however, at a restaurant in Orange, Korbel told Passante that he wasn’t going to get his 3 percent. In essence, Kughn had been given Passante’s 3 percent in the redistribution of stock occasioned by Kughn’s investment.
 

 The next month Passante filed this lawsuit. Andy Prendiville was also named as a plaintiff because Passante told him, after the August 2 meeting, that “because of his being so instrumental in obtaining the $100,000 loan” “half of whatever [Passante] got was his.”
 

 As set forth in his second amended complaint, Passante sued McWilliam for intentional interference with prospective advantage, negligent interference with economic relationship, bad faith, breach of fiduciary duty, bad faith denial of contract, conversion, intentional interference with contract,
 
 *1246
 
 fraud, negligent misrepresentation, unjust enrichment, intentional fraudulent misrepresentation, and equitable estoppel. He sued Upper Deck for negligent interference with economic relationship, bad faith, bad faith denial of contract, conversion, unjust enrichment, intentional fraudulent misrepresentation, and equitable estoppel. He sued Boris Korbel for negligent interference with economic relationship, bad faith, breach of fiduciary duty, breach of oral contract, bad faith denial of contract, conversion, fraud, negligent misrepresentation, constructive trust, unjust enrichment, intentional fraudulent misrepresentation, and equitable estoppel.
 
 [5]
 

 Passante did not sue the Upper Deck for breach of oral contract.
 

 All breach of fiduciary duty and intentional fraudulent misrepresentation claims were dismissed pursuant to sustained demurrers. The bad faith, fraud and negligent misrepresentation were dismissed pursuant to stipulation after the trial court refused, as a sanction for not having disclosed the identity of the witness during discovery, to allow Passante to present the testimony of Daniel Lybarger, a former controller of the Upper Deck, who would have testified that McWilliam actually knew that Passante had been given 3 percent of the company’s stock.
 

 After the close of the plaintiffs’ case, the trial judge granted nonsuit motions which eliminated all remaining claims against McWilliam, the Upper Deck, and Korbel except the 11th cause of action for breach of fiduciary duty and imposition of a constructive trust against Korbel only. However, the trial judge also granted Passante’s request to add a claim for breach of oral contract against the Upper Deck.
 

 The claim against the Upper Deck and the claim against Korbel went to the jury. The jury found for Passante and awarded him some $32 million against Upper Deck and $1 million against Korbel. The Upper Deck then moved for a judgment notwithstanding the verdict or, alternatively, a new trial; the trial court granted both. The trial judge also determined that the sole remaining claim against Korbel was equitable in nature and, in a tentative decision issued July 2, 1993, gave judgment for Korbel on that claim, finding that there was no transaction between Korbel and Passante “which could serve as a basis for imposing a constructive trust.”
 

 Two formal judgments were filed August 3,1993, one in favor of both the Upper Deck and McWilliam, the other in favor of Korbel on the equitable cause of action. Passante then filed this appeal from those judgments.
 

 
 *1247
 
 Discussion
 

 In his opening brief Passante asserts that “[a]n enforceable contract requires only a promise capable of being enforced and consideration to support the promise.” As framed, the assertion is incomplete. Consideration must also be given in exchange for the promise. Past consideration cannot support a contract. (See
 
 Leonard
 
 v.
 
 Gallagher
 
 (1965) 235 Cal.App.2d 362, 373 [45 Cal.Rptr. 211] [“It appears to be the universal rule throughout the United States that past consideration will not support a promise which is in excess of the promisor’s existing debt or duty.”].)
 

 Cases relied on by Passante merely demonstrate the rule that the extinguishment of a preexisting obligation, or the rendering of past services
 
 with the expectation of future payment,
 
 constitute sufficient consideration for a contract. In
 
 Parke etc. Co.
 
 v.
 
 San Francisco Bridge Co.
 
 (1904) 145 Cal. 534 [78 P. 1065], the plaintiff was an agent of the defendant who had been clearly working with the expectation of payment all along. In
 
 Raichart
 
 v.
 
 Phillips
 
 (1953) 120 Cal.App.2d 645, 651-652 [261 P.2d 777], the appellate court was able to infer from the record the existence of a preexisting obligation and a clear expectation of payment. In
 
 Blonder
 
 v.
 
 Gentile
 
 (1957) 149 Cal.App.2d 869, 874-875 [309 P.2d 147], the appellate court stressed that the recital in a written agreement, “in consideration of the services heretofore rendered,” was not conclusive because the “true consideration” was a promise made at the time,
 
 not
 
 the past services ostensibly referred to. Indeed, the
 
 Blonder
 
 court acknowledged that “The general rule is that a past consideration is not sufficient to support a contract.”
 
 (Id.
 
 at p. 874.)
 

 As a matter of law, any claim by Passante for breach of contract necessarily founders on the rule that consideration must result from a bargain. (E.g.,
 
 Simmons
 
 v.
 
 Cal. Institute of Technology
 
 (1949) 34 Cal.2d 264, 272 [209 P.2d 581] [“But the consideration for a promise must be an act or a return promise, bargained for and given in exchange for the promise.”];
 
 Enslow
 
 v.
 
 von Guenthner
 
 (1961) 193 Cal.App.2d 318 [14 Cal.Rptr. 231] [building contractor’s promise to replace defective roof held unenforceable because not bargained for];
 
 Dow
 
 v.
 
 River Farms Co.
 
 (1952) 110 Cal.App.2d 403, 410-411 [243 P.2d 95] [corporate resolution to pay executive $50,000 in consideration of past services rendered held unenforceable given absence of any expectation of payment when services were rendered].)
 

 Thus if the stock promise was truly bargained for, then he had an obligation to the Upper Deck, as its counsel, to give the firm the opportunity to have separate counsel represent it in the course of that bargaining. The legal profession has certain rules regarding business transactions with
 
 *1248
 
 clients. Rule 3-300 of the California Rules of Professional Conduct (formerly rule 5-101) forbids members from entering “a business transaction with a client” without first advising the client “in writing that the client may seek the advice of an independent lawyer of the client’s choice.”
 

 Here it is undisputed that Passante did not advise the Upper Deck of the need for independent counsel in connection with its promise, either in writing or even orally. Had he done so
 
 before
 
 the Upper Deck made its promise, the board of directors might or might not have been so enthusiastic about his finding the money as to give away three percent of the stock. In a business transaction with a client, notes our Supreme Court, a lawyer is obligated to give “ ‘his client “all that reasonable advice against himself that he would have given him against a third person.” ’ ”
 
 (Beery
 
 v.
 
 State Bar
 
 (1987) 43 Cal.3d 802, 813 [239 Cal.Rptr. 121, 739 P.2d 1289], quoting
 
 Felton
 
 v.
 
 Le Breton
 
 (1891) 92 Cal. 457, 469 [28 P. 490].)
 
 Bargaining
 
 between the parties might have resulted in Passante settling for just a reasonable finder’s fee. Independent counsel would likely have at least reminded the board members of the obvious—that a grant of stock to Passante might complicate future capital acquisition.
 

 For better or worse, there is an inherent conflict of interest created by any situation in which the corporate attorney for a fledging company in need of capital accepts stock as a reward for past service. As events in this case proved out, had the gift of 3 percent of the company’s stock been completed, it would have made the subsequent capital acquisition much more difficult.
 

 Passante’s rejoinder to the ethics issue is, as we have noted, to point to the evidence that the stock was virtually thrust at him in return for what he had done. The terms were totally dictated by the Upper Deck board. And that is it, precisely. There was no bargaining.
 

 But a close reading of the facts shows that the stock had not been bargained for in exchange for arranging the loan; Passante had already arranged the loan (even though the loan had not been formally accepted by the board) before the idea of giving him stock was ever brought up. There is no evidence that Passante had any expectation that he be given stock in return for arranging the $100,000 loan. Clearly, all of Passante’s services had already been rendered by the time the idea of giving Passante some stock was proposed.
 
 [6]
 
 As the court in
 
 Dow
 
 plainly stated, “. . .if there was no expectation of payment by either party when the services were rendered,
 
 *1249
 
 the promise is a mere promise to make a gift and not enforceable.”
 
 (Dow
 
 v.
 
 River Farms Co., supra,
 
 110 Cal.App.2d at p. 410.)
 

 Conclusion
 

 The promise of 3 percent of the stock was not a reward contract; it was Passante who first told Korbel that “funds were available.” It was simply, to use a phrase usually associated with life insurance contracts, an inchoate gift—that is, an unenforceable promise from a grateful corporate board.
 
 [7]
 
 Like the corporate resolution in
 
 Dow,
 
 it represented a moral obligation. And like the corporate resolution in
 
 Dow,
 
 it was legally unenforceable. (See
 
 Dow
 
 v.
 
 River Farms Co., supra,
 
 110 Cal.App.2d 403 [company executive rendered services without expectation of payment, thus subsequent promise by board to pay him $50,000 for those services as soon as the company became free of floating indebtedness was unenforceable].)
 
 [8]
 

 Our conclusion about the contract issue necessarily obviates all other issues in this appeal, including those involving any promise by Korbel to hold Passante’s interest for him, all of which are predicated on the idea that Passante had a bargain with the Upper Deck. The judgments in favor of McWilliam, the Upper Deck, and Korbel are affirmed.
 

 Crosby, J., and Rylaarsdam, J., concurred.
 

 [1]
 

 See Comment,
 
 University Trading Cards: Do College Athletes Enjoy a Common Law Right to Publicity
 
 (1994) 4 Seton Hall J. Sport L. 143, 153 (“trading cards have become a tremendous financial industry”); see also Will, Men at Work: The Craft of Baseball (1990) at page 295 (“Today baseball is big business, part of the vast entertainment industry that has grown in response to the growth of leisure time and disposable income.”).
 

 [2]
 

 Because Passante prevailed with the jury on his contract claim, all reasonable conflicts and inferences are resolved in his favor. Accordingly, we assume, even though the evidence was in conflict on the point, that the $100,000 loan was vital to the survival of the company.
 

 [3]
 

 Our narrative at this point closely tracks Passante’s testimony on both direct and cross-examination as to the circumstances which brought about the $100,000 loan. All quotes are taken directly from Passante’s own testimony.
 

 [4]
 

 And, as it turned out, would have made the loan without interest.
 

 [5]
 

 Kughn was also sued, but all claims against him were eliminated through a nonsuit motion and he is not a party to this appeal.
 

 [6]
 

 In response to the point that the loan had been, in actuality, made earlier that morning, Passante makes the distinction between merely putting money in an account controlled by
 
 *1249
 
 Korbel (which happened about 11 a.m. on July 29) and the actual acceptance of the loan by the board later that evening. The distinction does not help him. Regardless of whether the loan is characterized as having been in the morning or the evening, the undisputed fact is that Passante had already done what the board wanted to reward him for—finding the money—by the time the board proposed to give him stock for it.
 

 [7]
 

 The elements of a gift include delivery, either actual or symbolical. (See
 
 Jaffe
 
 v.
 
 Carroll
 
 (1973) 35 Cal.App.3d 53, 59 [110 Cal.Rptr. 435]; see also Black’s Law Dict. (5th ed. 1979) p. 619, col. 1 [requisites of gift include completed delivery to or for donee].) Passante has never argued that there was delivery of the stock such that a gift had been made.
 

 [8]
 

 The question of what ethical duties apply when a client offers an attorney a gift has not been briefed and we do not address it. Passante’s entire focus has been on enforcing the promise of stock as the fruit of a
 
 bargain,
 
 not as a completed gift.