Filed 3/6/15  American Rag v. Haralambus CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| AMERICAN RAG CIE, LLC, | B246285 |
| Plaintiff, Cross-defendant and Appellant, | (Los Angeles County Super. Ct. No. BC446588) |
| v. | |
| HARRY HARALAMBUS, | MODIFICATION OF OPINION [NO CHANGE IN JUDGMENT] |
| Defendant, Cross-complainant and Appellant; | |
| LARRY RUSS, et al., | |
| Cross-defendants and Respondents. | |

It is ordered that the opinion filed herein on February 27, 2015, be modified as follows:

On the fourth line of the first page, the counsel description for Defendant, Cross-complainant and Appellant should read:  "C. Athena Roussos and William D. Becker for Defendant, Cross-complainant and Appellant."

_____        _____        _____
TURNER, P.J.                          MOSK, J.                          GOODMAN, J. *

---

*        Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 2/27/15  American Rag v. Haralambus CA2/5 (unmodified version)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| AMERICAN RAG CIE, LLC, | B246285 |
| Plaintiff, Cross-defendant and Appellant, | (Los Angeles County Super. Ct. No. BC446588) |
| v. | |
| HARRY HARALAMBUS, | |
| Defendant, Cross-complainant and Appellant; | |
| LARRY RUSS, et al., | |
| Cross-defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ronald M. Sohigian, Judge.  Affirmed.

David C. Codell for Plaintiff, Cross-defendant and Appellant.

William D. Becker for Defendant, Cross-complainant and Appellant.

Russ, August & Kabat, Michael S. Brophy and Nathan D. Meyer for Plaintiff, Cross-defendant and Appellant, and for Cross-defendants and Respondents.

# I. INTRODUCTION

Plaintiff, American Rag Cie, LLC, and defendant, Harry Haralambus, appeal from a judgment and an order following a bench trial. Plaintiff filed a complaint against defendant alleging fiduciary duty and contract breach, declaratory relief and unjust enrichment claims. Defendant filed a cross-complaint against plaintiff and cross-defendants, Larry Russ and Mark Werts, alleging several claims, including fiduciary duty and contract breach and fraud. Mr. Russ, Mr. Werts and defendant are all owners of plaintiff and other businesses.

A bench trial was held to first resolve the declaratory relief and fiduciary duty breach claims because they were equitable in nature. At the conclusion of the bench trial, the trial court entered judgment against all the parties' causes of action except for the declaratory relief claim. The trial court determined an oral contract existed between plaintiff and defendant. The trial court: ruled plaintiff agreed to pay defendant a percentage of royalties received by it from an April 1, 2003 license agreement; calculated a monetary judgment in favor of defendant for contract breach based on royalties received; and dismissed all the remaining legal claims as having been resolved during the bench trial. Defendant subsequently moved for attorney's fees, arguing that an indemnification provision in plaintiff's operating agreement entitled him to recover the fees. The trial court denied defendant's attorney's fees motion. We affirm.

# II. BACKGROUND

## A. Plaintiff's Complaint

On September 30, 2010, plaintiff filed its complaint against defendant for fiduciary duty and contract breach, declaratory relief and unjust enrichment. Plaintiff alleges the following. Defendant was a 14 percent shareholder of plaintiff. Defendant was also a licensing agent for plaintiff. Mr. Werts orally agreed to support defendant's

endeavors.  Defendant was to receive 5 percent of the royalties plaintiff received from a license with Macy's Department Stores.  Defendant failed to secure any international licensing agreement from 2003 to 2010.  Defendant received over $350,000 in payment from plaintiff.  Later, plaintiff discovered defendant had entered into a business deal with Victor Siasat in the Philippines.  Mr. Siasat operated several of plaintiff's stores without its awareness.  Mr. Siasat, through a company, entered into a licensing agreement with plaintiff on May 18, 2010.  Mr. Siasat had yet to pay plaintiff any licensing fees.  Plaintiff alleges defendant was responsible for the non-payment of royalties from Mr. Siasat to the company.

Plaintiff alleges defendant engaged in self-dealing and breached his fiduciary duty to it.  And defendant breached his oral contract by failing to use his best efforts to acquire licenses for plaintiff.  Also, plaintiff:  seeks declaratory relief concerning defendant's breach of the oral contract; claims defendant was unjustly enriched; and prays for compensatory damages, declaratory relief, costs, attorney's fees and other relief.

B.  Defendant's First Amended Cross-Complaint and Amended Seventh Cause of Action for Fraud

On February 15, 2011, defendant filed the first amended cross-complaint against plaintiff, Mr. Werts and Mr. Russ.  Defendant alleges the following.  Plaintiff and Tarrant Apparel Group had entered into a written contract on April 1, 2003.  Paragraph 5 of that agreement provided, "The Company has agreed to pay [defendant] a finder's fee of 5% of the Company's royalty receipts from North America licenses and 15% of the Company's licensing royalties outside of North America, excluding Japan."  Defendant contends this written agreement memorialized an oral contract between Mr. Werts and defendant.

Mr. Werts and defendant entered into an oral agreement.  Plaintiff, under the oral agreement's terms, was to pay defendant a 5 percent finder's fee for royalty receipts from North America licenses.  Plaintiff was to pay a 15 percent finder's fee for licensing royalties outside of North America, excluding Japan.  In exchange, defendant would

3

facilitate the purchase of Margot Werts's ownership interest in plaintiff. The royalties were paid to defendant as consideration for putting the deal between Tarrant Apparel Group and plaintiff together. Defendant received payments under the contract from April 1, 2003 until 2010.

On August 2, 2006, Mr. Werts, Mr. Russ, and defendant formed World Denim Bar, LLC in California. World Denim Bar, LLC would offer a wide range of denim brands. Plaintiff operated a World Denim Bar location at its store on La Brea Avenue in Los Angeles. World Denim Bar, LLC was in negotiations to open a retail facility in the Fashion Island shopping center in Newport Beach. At the same time, Mr. Werts and Mr. Russ were in the process of dissolving World Denim Bar, LLC. Defendant repeatedly requested information relating to the negotiation of the lease and other business issues related to the opening of the World Denim Bar location in Fashion Island. His fellow members and managers refused to provide him any information.

On August 6, 2010, defendant submitted a 30-day notice to World Denim Bar, LLC indicating he received an offer to transfer his interest for $425,000. On July 29, 2010, during a membership meeting, the other members voted to dissolve World Denim Bar, LLC. The dissolution plan involved liquidation of assets at a public auction. Defendant believed the dissolution plan did not accurately reflect the assets owned by World Denim Bar, LLC. Defendant demanded a list of World Denim Bar, LLC assets subject to auction. World Denim Bar, LLC refused to provide defendant with a list.

Defendant asserts nine causes of action: contract breach against plaintiff for refusing to provide further payments to him under the written agreement between Tarrant Apparel Group and plaintiff; contract breach against plaintiff for violation of an oral contract between plaintiff and defendant to pay him domestic and international royalties; defamation against plaintiff, Mr. Werts and Mr. Russ for their complaint's allegations; conspiracy against all defendants to deprive defendant of ownership and membership in plaintiff; unfair business practices against plaintiff, Mr. Werts, and Mr. Russ in violation of Business and Professions Code section 17200; fiduciary duty breach against Mr. Russ and Mr. Werts for attempting to dissolve World Denim Bar, LLC for their own personal

4

benefit and to defendant's detriment as a minority shareholder; fraud against Mr. Russ and Mr. Werts for attempting to divest defendant of valuable assets in World Denim Bar, LLC; intentional interference with prospective contractual relations against Mr. Russ and Mr. Werts by interfering with defendant's attempted transfer of his World Denim Bar, LLC interests to a purchaser for value; and negligent interference with prospective contractual relations against plaintiff, Mr. Russ, and Mr. Werts. Defendant seeks contractual, general, specific and punitive damages, restitution, pre-judgment interest, costs, and other relief. William D. Becker acted as defendant's counsel for the filing of the first amended cross-complaint. Mr. Becker's role will become pertinent when evaluating defendant's attorney's fees motion.

On April 13, 2012, the trial court granted a motion by Mr. Werts and Mr. Russ for judgment on the pleadings as to defendant's fraud claim. Defendant was granted leave to amend the claim. On April 23, 2012, defendant, representing himself, filed an amendment to his seventh cause of action for fraud. Defendant made the following allegations. In February 2010, Mr. Werts and Mr. Russ informed defendant they no longer wanted to maintain their business relationship. During settlement discussions on April 11, 2010 and June 26, 2010, defendant was encouraged to sell his interest in plaintiff and related business entities. This advice came from Mr. Russ and other members of the various business arrangements. Defendant acted upon Mr. Russ's representations. Defendant negotiated in good faith to sell his interest in plaintiff's entities. On July 29, 2010, Mr. Russ and Mr. Werts adopted a dissolution plan for World Denim Bar, LLC. The listed assets for World Denim Bar, LLC include the company's trademark, applications, good will and the La Brea Avenue lease. The assets did not include agreements with plaintiff.

On August 4, 2010, defendant communicated with Mr. Russ and Mr. Werts. Defendant expressed his intention to sell his share in plaintiff's companies. On August 6, 2010, defendant formally advised the other owners of his intention. Defendant's interest was $3.8 million, $425,000 of which was attributable to World Denim Bar, LLC. On August 24, 2010, Mr. Russ spoke to defendant. On that occasion, defendant was told that

5

he could sell his share to a third party. On August 26 and August 27, 2010, defendant unsuccessfully attempted to obtain a temporary restraining order on the pending auction of the World Denim Bar, LLC assets. In September 2010, Mr. Russ and Mr. Werts dissolved World Denim Bar, LLC with the California Secretary of State. They incorporated Industrie Denim, which was a replica of World Denim Bar, LLC's business plan.

Defendant was unable to sell his interest in the plaintiff's companies. This was because of Mr. Russ and Mr. Werts's misrepresentation. Mr. Werts acquired all the assets of World Denim Bar, LLC for $50,000. Mr. Werts and Mr. Russ's misrepresentation cost defendant $425,000. Defendant sustained his loss because he was unable to sell his membership interest. Defendant claimed Mr. Russ and Mr. Werts acted with malice, oppression and fraud because of personal animosity and no longer wishing to do business with him.

## C. Bench Trial

On June 21, 2012, the trial court issued a minute order severing the various causes of action. The trial court ordered it would try without a jury the following causes of action: plaintiff's fiduciary duty breach claim; plaintiff's declaratory relief claim; defendant's unfair competition claim; and defendant's fiduciary duty breach claim. The fiduciary duty breach and declaratory relief claims were found to be equitable. The unfair business practice claim could also be tried without a jury. Defendant declined to proceed on his fifth cause of action for defamation. Defendant later declined to proceed on his unfair business practice claim. The bench trial began June 22, 2012. It ended on July 24, 2012. We will discuss the relevant evidence while analyzing the parties' contentions.

## D. The Trial Court's Proposed Statement of Decision

On July 25, 2012, the trial court orally declared its statement of decision. As to plaintiff's fiduciary duty breach claim, the trial court found in defendant's favor. As to the declaratory relief claim, the trial court determined the nature of the oral contract between Mr. Werts, who represented plaintiff, and defendant. The trial court stated: "I find that exhibit 10, which was the writing of the 1st of April, 2003, is not itself an agreement . . . to which [defendant] was a party. It is, rather, a declaration on the part of Russ, accepted by Mr. Werts, about what they had agreed would be paid to [defendant] for acts already performed by [defendant]. . . . [¶] . . . [¶] The obligation . . . involves, among other things, the following duties on the part of [defendant]: [¶] [defendant] must not do anything to foul up the licensing agreement that's already been made with . . . Tarrant or Guez's company."

The trial court further stated: "[Defendant] is entitled to payments under that licensing arrangement with [Mr. Guez's company], for so long as they go on in the future. The consideration for that was [defendant's] services to Werts and [plaintiff] . . . . [¶] Those obligations were taken on. They were assumed by the plaintiff in this action. The plaintiff in this action complied with those obligations for a substantial period of time and paid a substantial amount of money to [defendant] at a time when and before and after it knew all the facts it knew when it filed this case. So it acknowledged by conduct the obligation owed to [defendant]." The trial court cited the practical construction doctrine in support of this conclusion.

Regarding defendant's role in helping Mr. Werts resolve his divorce proceedings, the trial court declared: "The relationship between Mr. Werts and Margot Werts, in connection with the divorce, generated a great deal of difficulty about how to get Margot Werts out of the picture. . . . [¶] Mr. Werts's problem was that he didn't have enough money to buy Margot Werts's share and didn't know exactly how that could be done. [Defendant] and Werts had discussions about facilitating the buyout of Mrs. Werts's

7

shares. [¶] [Defendant] assisted in setting up the arrangement with other investors to take over Margot Werts's interest. One of those investors was, as it turns out, Guez. That was an advantage to American Rag, or at least it was perceived as being an advantage, because Guez was a person supposedly who knew a lot about the clothing business and was in the clothing business. [¶] . . . [¶] . . . Guez's company was the principal acquirer of Mrs. Werts's interest through a series of financial transactions. Mr. Werts felt it would be advantageous to his enterprises to be in a combination with Guez's company. Guez's company at that time was publicly traded. So [defendant] supposedly then was made to back out of the investment deal. [¶] . . . [¶] . . . [Defendant's] compensation under exhibit 10 . . . did not require him to do further work. His compensation was for past done work."

The trial court also addressed defendant's fiduciary duty breach claim against plaintiff, Mr. Werts and Mr. Russ. The trial court stated: "My view is that Russ and Werts did violate their fiduciary obligation to [defendant] by the rapid transaction involving the dissolution of [World] Denim Bar . . . and the sale of its name which Werts bought at auction for $50,000. [¶] . . . But I find that the evidence does not show the occurrence of injury, damage, loss, or harm to [defendant] or the causal connection between injury, damage, loss, or harm in the way [defendant] asserts. [¶] . . . [¶] Mr. Rousseau demonstrated both here on the witness stand and in that letter that he was keeping all options open. Moreover, the assignment of the $425,000 value to . . . [¶] . . . [¶] . . . World Denim Bar is completely arbitrary and unsupported. It was a company that basically had no profit production history. . . . [¶] . . . [¶] . . . I've put no weight on the $425,000 amount, and [Mr.] Rousseau made it clear why. He said, 'Look, I don't care how you organize or set prices on these things, and I don't care where the income or the profit is coming from. It's in there somewhere.' [¶] . . . [¶] . . . [H]ere, there is virtually nothing to indicate that there was a value in World Denim Bar that we can convert into money."

8

E.  Dismissal of All Remaining Claims and Supplemental Statement of Decision

On October 15, 2012, the parties argued whether any claims remained requiring jury trial.  Michael Brophy, counsel for plaintiff, Mr. Werts and Mr. Russ, argued defendant's alleged harm stemming from fraud was based on Mr. Rousseau's offer of $425,000.  The loss of Mr. Rousseau's offer was also the alleged damage for defendant's fiduciary duty breach claim.  Because the trial court had found no damages occurred under defendant's fiduciary duty breach claim, Mr. Brophy argued there were no damages legally caused by Mr. Russ and Mr. Werts's alleged fraud.

Defendant argued the court's finding of no damages for his fiduciary duty breach claim was not relevant to his other claims, like fraud.  Defendant asserted Mr. Russ and Mr. Werts's alleged misrepresentation was a distinct claim from his fiduciary duty breach claim.  The trial court found there was nothing remaining to be tried by a jury.  The trial court concluded it had decided the fraud claim adversely to defendant for the reasons provided by Mr. Brophy.

The trial court also addressed plaintiff's various objections to the tentative statement of decision.  The trial court stated regarding consideration:  "[Defendant's] consideration was the obtaining of the deal.  [Plaintiff's] consideration  . . . was the agreement to pay [defendant] on the basis of the percentage schedule. . . .  And my view is that that was very, very clearly understood by both [plaintiff] and Werts and Russ and [defendant]."  The trial court later stated regarding consideration:  ". . . I said on the 25th of July, 2012, that [defendant] must not do anything to foul up the licensing agreement that's already been made.  [¶] . . . [¶] . . . [W]hat I'm saying is he cannot both disrupt the deal that exists and receive payments for so long as that licensing agreement continues in existence."

## F.  Judgment

On December 10, 2012, the trial court issued its judgment.  It ordered that plaintiff recover nothing on its complaint against defendant.  The trial court adjudged the terms of the contract as follows:  "[Plaintiff] is to pay [defendant] five percent of the North American (United States, Mexico and Canada) royalty receipts it receives pursuant to that certain License Agreement between American Rag Cie, II Inc. and Private Brands, Inc., effective April 1, 2003, and any amendments thereto, including, without limitation, the Amended License Agreement between [plaintiff] and Private Brands, Inc. dated as of October 1, 2008 (collectively, the 'Tarrant/Guez License'). . . .  [¶]  . . . If [plaintiff] receives royalty receipts under the Tarrant/Guez License from sales outside of the United States, Canada, Mexico or Japan,  [plaintiff] shall pay [defendant ] fifteen percent of those royalty receipts . . . ."

The trial court found defendant was entitled to a monetary judgment for contract breach.  Defendant was to receive 5 percent for each payment plaintiff received under the Tarrant/Guez License from April 1, 2010, to December 10, 2012, inclusive plus 10 percent interest.  The trial ordered defendant take nothing on his claims for conspiracy, fraud, fiduciary duty breach, and intentional or negligent interference with prospective economic relations.

## G.  Defendant's Attorney's Fees Motion

On February 19, 2013, defendant filed an attorney's fees motion.  Mr. Becker represented defendant prior to the bench trial from September 30, 2010, to December 9, 2011, and from January 7, 2013, to the filing of the attorney's fee motion.  Defendant relied on the indemnification provisions of plaintiff's operating agreement.  Defendant contends he is entitled to receive attorney's fees because he is a covered person within the meaning of the operating agreement and should be indemnified against any liability.  On March 14, 2013, plaintiff filed its opposition to defendant's attorney's fees motion.

10

Regarding the indemnification provision, plaintiff argued it applied only to third-party claims against covered persons under the operating agreement. On March 21, 2013, defendant filed his reply. Defendant argued plaintiff is obligated to pay his attorney's fees because of the scope of the indemnity arrangement. On March 27, 2013, the trial court heard the attorney's fee motion. It denied the motion in its entirety on the grounds provided in plaintiff's opposition.

## III. DISCUSSION

### A. Plaintiff's Appeal

#### 1. Plaintiff has forfeited the right to challenge the trial court's factual findings

Defendant argues that plaintiff's failure to fairly summarize all of the material evidence forfeits its substantial evidence contentions. We agree. Plaintiff's briefing is essentially a one-sided analysis of the evidence. Plaintiff has failed to discuss evidence which is favorable to defendant concerning the oral contract and its ensuing conduct. Under the circumstances, it is appropriate that we deem all of plaintiff's substantial evidence contentions forfeited. (*Forman & Clark Corporation v. Fallon* (1971) 3 Cal.3d 875, 881; *Doe v. Roman Catholic Archbishop* (2009) 177 Cal.App.4th 209, 218.)

#### 2. Substantial evidence supports the trial court's factual findings

Even if we did not find that plaintiff has forfeited the right to contest the trial court's factual findings, we would still find substantial evidence supports the judgment. The judgment in favor of defendant was a result of a determination of the merits of the declaratory relief claim. Our Supreme Court has held: "'"The purpose of a declaratory judgment is to 'serve some practical end in quieting or stabilizing an uncertain or disputed jural relation.'" [Citation.] "Another purpose is to liquidate doubts with respect

11

to uncertainties or controversies which might otherwise result in subsequent litigation [citation]." [Citation.]'" (*Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 647; accord, *Osseous Technologies of American, Inc. v. DiscoveryOrtho Partners LLC* (2010) 191 Cal.App.4th 357, 364.) We defer to the trial court's factual findings if they are supported by substantial evidence. (*Diablo Valley College Faculty Senate v. Contra Costa Community College Dist.* (2007) 148 Cal.App.4th 1023, 1031; *Franzosi v. Santa Monica Community College Dist.* (2004) 118 Cal.App.4th 442, 447.) Our Supreme Court has held, "Substantial evidence is not any evidence—it must be reasonable in nature, credible, and of solid value." (*Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 51; *Las Palmas Associates v. Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220, 1239.) The Courts of Appeal have held, "To the extent the declaratory relief claim was decided on stipulated and undisputed evidence, our review of the matter is de novo. [Citations.]" (*Cebular v. Cooper Arms Homeowners Assn.* (2006) 142 Cal.App.4th 106, 119; see *Dolan-King v. Rancho Santa Fe Assn.* (2000) 81 Cal.App.4th 965, 974.) De novo review also applies to contract interpretation unless interpretation turns on the credibility of conflicting evidence. (*Assn. of Orange County Deputy Sheriffs v. County of Orange* (2013) 217 Cal.App.4th 29, 46; *City of El Cajon v. El Cajon Police Officers' Assn.* (1996) 49 Cal.App.4th 64, 71.) But the most important rule of appellate review to this case is we may not reweigh conflicting evidence and inferences. (*Scott v. Pacific Gas & Electric Co.* (1995) 11 Cal.4th 454, 465, disapproved on another point in *Guz v. Bechtel Nat. Inc.* (2000) 24 Cal.4th 317, 352, fn. 17; *Sanchez v. Sanchez* (1961) 55 Cal.2d 118, 126.)

Plaintiff argues the judgment must be reversed because there is no evidence defendant provided any legal consideration for the buyout of Ms. Wert's ownership. Plaintiff reasons defendant provided no legal consideration for the April 1, 2013 deal memorandum. Plaintiff reasons that all of the work defendant provided prior to that date is, as a matter of law, past consideration. And plaintiff argues, past consideration may not support defendant's right to payments under the April 1, 2013 deal memorandum. (*Herbert v. Lankershim* (1937) 9 Cal.2d 409, 478; *Mulford v. Estudillo* (1861) 17 Cal.

12

618, 620; *Lagomarsino v. Giannini* (1905) 146 Cal. 545, 546-547; *Passante v. McWilliam* (1997) 53 Cal.App.4th 1240, 1247; *Leonard v. Gallagher* (1965) 235 Cal.App.2d 362, 373; *Blonder v. Gentile* (1957) 149 Cal.App.2d 869, 874; *Dugan v. Pettijohn* (1955) 134 Cal.App.2d 133, 138; *Walsh v. Parker* (1937) 24 Cal.App.2d 224, 228-229.) Plaintiff also contends that the terms of the oral contract were so vague the agreement is unenforceable. And, plaintiff argues the statute of frauds prevents enforcement of the agreement. Finally, plaintiff argues the payments were a gift. We respectfully disagree.

The following constitutes substantial evidence that defendant entered into an oral binding agreement as early as February 2003 which was later evidenced in writing. In other words, plaintiff entered into an agreement with sufficiently specific terms to pursue the buyout of Ms. Werts's interest and be compensated for his work. According to defendant's special interrogatory responses, which were in evidence, the following were the series of events which preceded his oral agreement with plaintiff: "Prior to April 2003, [Mr.] Werts was conducting a contentious . . . divorce battle with his now ex-wife [Ms.] Werts. [Defendant] urged Werts to purchase his wife's ownership in [plaintiff]. Alternative[ly], to cooperate with the purchase of that interest by a group of individuals which [defendant] would form. The purchase of [Ms.] Werts's ownership interest for a sum of money that [Mr.] Werts himself was unwilling to pay had been one of the stumbling blocks in finalizing the divorce. [Defendant] agreed with Gerard Guez, H.I. Kim, and [Mr.] Russ that the aforementioned individuals would acquire [Ms.] Werts's ownership interest in [plaintiff] [¶] [Mr.] Werts was either unable or unwilling to acquire [Ms.] Werts['s] ownership interest. Alternatively, [Ms.] Werts was unwilling to sell her ownership interest to [Mr.] Werts."

Further, prior to finalizing the arrangement with defendant, the following occurred according to his special interrogatory answers: "Later, and during that negotiation, [Mr.] Guez indicated he would like his company, Tarrant Apparel [Group], to acquire all of [Ms.] Werts's interest in order to avoid a conflict with his partners. The tentative deal for acquiring the ownership interest, including a licensing agreement negotiated in principle,

13

with Macy's Merchandising Group and Federated Department Stores for the licensing of the [plaintiff's] mark to Macy's/Federated, the license agreement negotiations were kept confidential and not revealed to [Ms.] Werts in order that she not increase her asking price or terms and conditions of the sales of her ownership interests which would conclude the divorce. . . ."

Defendant testified that meetings were held in New York City between January 7 and 10, 2003, where the subject of the buyout was discussed. According to defendant, sometime during the early to mid-January time frame, it became apparent Mr. Guez became interested in buying all of Ms. Werts's interest in plaintiff. Mr. Werts met with defendant and they discussed a new way to approach the buyout of Ms. Werts's shares. Defendant described their discussions: "[Mr.] Werts had extensive discussions with me about that and essentially asked me if I could please withdraw my offer to be an investor, to offer my candidacy as an investor as part of the group that would acquire [Ms.] Werts's shares, and he said that he would like to make the deal with Tarrant [Apparel Group] as one single partner. [¶] I was not happy about that at the time." Mr. Werts promised to "pay . . . or repay" defendant for the work done in the preceding year during the negotiations.

Defendant testified the oral agreement was entered into as early as February 2003. Defendant testified at one point the oral agreement was entered into in February or March. Defendant also described a conversation in late February or early March with Mr. Werts. Defendant agreed not to become an owner in the new venture but rather to step aside: "Mr. Werts told me and we agreed that what would happen if I stepped aside -- in his words, a quid pro quo -- and made it easier for that deal to happen, and also he wanted to maintain his relationship with me because he saw great value in it and he saw great value in my knowledge and my background and how I had assisted him to bring him to that point, he said that I would be paid a finder's fee, and he would see to it that it was written somewhere or I would be safeguarded in the future and that I would receive 5 percent of the royalties for North America and 15 percent of the royalties for international pursuant to the agreements that would be concluded with Tarrant [Apparel Group ]. I

14

accepted that." According to defendant, the written documentation of the oral agreement was an April 1, 2003 memorandum which we will describe in detail later. Defendant also testified the foregoing conversations occurred several times during the month of March 2003.

Defendant described a conversation in March 2003 with Mr. Werts about the compensation to be provided, "[H]e told me that I would get paid the 5 percent and 15 percent commission as a finder's fee pursuant to the agreements and the license agreements and for the period of time that [plaintiff] would receive those royalties." Plaintiff further testified as to the duration of the royalty payments: "[I]t was understood that I'd get those commissions as long as the royalties were received. [¶] . . . [¶] . . . It certainly was going to be for as long as those agreements were in place." Mr. Werts never said there would be a cap on the amount of royalty payments defendant would receive. At another point, plaintiff testified concerning the payments he received over a seven-year period: "The performance and finder's fee and the remuneration of [myself] was connected to the deal between Tarrant [Apparel Group] and Federated [Department Stores] on one hand, and Tarrant [Apparel Group], Private Brands [Inc.], and [plaintiff] on the other hand. [¶] The undertakings and obligations were that [I] was to receive these finder's fee payments and this remuneration as long as [plaintiff] received royalty payments from Tarrant [Apparel Group] and Private Brands [Inc.] pursuant to the deal with Macy's [Department Store]."

Defendant testified he provided three services which eventually led to the purchase of Ms. Werts's interest. Those three services were: defendant helped put together the investor group to purchase her interest; defendant negotiated the ultimate contractual arrangement between plaintiff and Macy's and Ms. Werts; and defendant advised Mr. Werts how to accomplish these matters during the pending divorce proceedings.

On April 1, 2003, the so-called deal point memorandum was entered into by: Mr. Werts on behalf of himself, Industries Werts, Inc. and plaintiff; Jacques Rudolphe Faulcon; and Mr. Guez on behalf of Tarrant Apparel Group. Near the beginning of the

15

deal point memorandum, the following appears, "In consideration of the foregoing [promises], and *for other good and valuable consideration* the receipt and sufficiency of which are hereby knowledge, Tarrant [Apparel Group], [Mr.] Werts and [Mr.] Faulcon agreed to the following deal points . . . ." (Italics added.) Paragraph 5 of the April 1, 2003 agreement states in part, "The Company has agreed to pay [defendant] a finder's fee of 5% of the Company's royalty receipts from North America licenses and 15% of the Company's licensing royalties outside North America, excluding Japan." Plaintiff testified that the language in the April 1, 2003 agreement was a memorialization of multiple conversations with Mr. Werts. Further, plaintiff's July 10, 2013 directors board's minutes state: "There were further discussions on [defendant's] role. It was agreed that [defendant] would receive 5% of any [North American] license royalty, 15% of any international royalty, and 15% from Tarrant [Apparel Group]."

Thereafter, defendant testified that plaintiff regularly sent him royalty checks it received from Private Brands. Defendant testified the payments he continuously received were pursuant to the April 1, 2003 memorandum: "That's the binding deal point memorandum that memorializes the agreement between [Mr.] Werts . . . and [myself] on the issue of the finder's fee and how [I] was to be paid for the work that [I] performed. [¶] . . . Not only was it memorialized but it was acted upon because for the ensuing seven, eight years, consistently, continuously, and uninterruptedly, those payments were made to [me] . . . ."

Additionally, numerous checks were received in evidence which were paid to defendant. The payments were made automatically; there was no requirement that defendant submit an invoice. Stuart Graves, plaintiff's chief financial officer, identified financial record showing the payments to defendant. Mr. Graves testified that in appoximately 2007, the accounting records for the payments were changed from "contract labor" to "royalty commission." Mr. Graves testified the payments to defendant were equivalent to 5 percent of the royalties received from Tarrant Apparel Group. On several occasions, utilizing the 5 percent figure, insufficient royalties were paid to defendant. Thereafter, "so-called catch-up" payments were made to defendant.

16

The last payment to defendant was made in April 2010. Mr. Werts ordered Mr. Graves to stop paying the royalty commissions after that date.

The foregoing evidences the existence of an agreement entered into prior to the April 1, 2003 memorandum. As early as February 2003, there is evidence the parties agreed that defendant would use his skills to help resolve financial problems resulting from Mr. Werts's ongoing divorce. Defendant was able to: assist in forming the investor group to purchase Ms. Werts's interest in Tarrant Apparel Group; negotiate the ultimate contractual arrangement between plaintiff and Macy's and Ms. Werts; and advise Mr. Werts how to accomplish these matters during the pending divorce proceedings. Apart from the services provided by defendant to his potential co-investors, there is evidence that as early as February 2003 he agreed to withdraw from the proposed investor group. Defendant was unhappy about the proposal but agreed to do so because it enhanced the chances of a profitable agreement being consummated. In exchange, he was to receive the royalties specified in the April 1, 2003 agreement. The services provided by defendant, his withdrawal as a member of the proposed investor group, or a combination of the two events constitute consideration. And, the April 1, 2003 memorandum acknowledges the agreement is supported by sufficient consideration. This creates a presumption of adequate consideration. (Civ. Code, § 1614; *Webb v. Pillsbury* (1943) 23 Cal. 2d 324, 330; *San Diego City Firefighters, Local 145 v. Board of Administration etc.* (2012) 206 Cal.App.4th 594, 619.) Further, the trial court could reasonably find the agreement which was enforced until 2010 was sufficiently enforceable notwithstanding any ambiguity. (*Bohman v. Berg* (1960) 54 Cal.2d 787, 794; *Holmes v. Lerner* (1999) 74 Cal.App.4th 442, 459.) And as defendant correctly notes, the parties' course of conduct is substantial evidence of their agreement. (*Bohman v. Berg*, *supra*, 54 Cal.2d at p. 796; *Crestview Cemetery Assn. v. Dieden* (1960) 54 Cal. 2d 744, 752-753.) Plaintiff's statute of frauds contention is meritless. There is substantial evidence defendant fully performed his obligations under the oral agreement. (*Dutton v. Interstate Investment Corp.* (1941) 19 Cal.2d 65, 70 ["[T]he finding of the trial court that Dutton had fully performed all of his obligations under the contract operates to remove the bar of the statute."]; see *Secrest*

17

*v. Security National Mortgage Loan Trust 2002-2* (2008) 167 Cal.App.4th 544, 556.)
The foregoing also disposes of plaintiff's arguments that the payments made until April 2010 were a gift.

No doubt, there are evidence and inferences which support plaintiff's arguments that the oral agreement is unenforceable for a variety of reasons. However, to accept plaintiff's analysis would require we reweigh the evidence and inferences. Apart from the fact that plaintiff's sufficiency of the evidence contentions are forfeited, we are prohibited from reweighing the testimony. (*Scott v. Pacific Gas & Electric Co.*, *supra*, 11 Cal.4th at p. 465; *Sanchez v. Sanchez*, *supra*, 55 Cal.2d at p. 126.) Finally, nothing about the trial court's findings is inconsistent with the foregoing analysis.

## B. Defendant's Appeal

### 1. The trial court properly denied defendant's jury trial request and dismissed his fraud claim

Defendant challenges the dismissal of his fraud claim. As noted, the trial court conducted a bench trial on the issue of the alleged fiduciary duty breach. The trial court ruled that Mr. Russ and Mr. Werts breached their fiduciary duties owed to defendant but no damages were proven. Defendant's fiduciary duty breach allegations in the first amended cross-complaint sought damages only from Mr. Russ and Mr. Werts. According to the fiduciary duty breach cause of action, Mr. Russ and Mr. Werts were majority shareholders of World Denim Bar, LLC. In their capacity as majority shareholders, they sold the assets of World Denim Bar, LLC at a "fire sale type" auction thereby damaging defendant. According to the first amended cross-complaint Mr. Russ and Mr. Werts understated the value of the assets in World Denim Bar, LLC. The first amended cross-complaint's cause of action for fiduciary duty breach alleges, "Instead of considering a $425,000 cash offer [from defendant], [cross-]defendants pursued a fire

18

sale type auction." The trial court ruled the $425,000 damage claim under the fiduciary duty breach claim was not substantiated.

The amended fraud claim likewise named only the cross-defendants, Mr. Russ and Mr. Werts. According to the seventh cause of action, the relationship between defendant and Mr. Russ and Mr. Werts broke down. As a result, defendant indicated to all of the owners that he wanted to sell his interest in plaintiffs related entities. The total value of defendant's share in World Denim Bar, LLC was, according to the amended fraud cause of action, $425,000. (This is the same sum sought in the fiduciary duty breach claim.) Defendant proceeded to negotiate in good faith with a Connecticut resident, Mr. Rousseau, concerning the sale of the interest in World Denim Bar, LLC which was valued at $425,000. Thereafter, various fraudulent statements were allegedly made by Mr. Russ and Mr. Werts and eventually World Denim Bar, LLC ceased to exist. Because the proposed sale to Mr. Rousseau could not be completed, defendant suffered a loss of $425,000. The trial court dismissed defendant's fraud claim because the alleged damages for the fiduciary duty breach and fraud claims were the same. In doing so, the trial court denied defendant's jury trial request. Defendant contends the fraud cause of action should have proceeded to jury trial.

Defendant argues he has a right to a jury trial on his fraud claim as a matter of right. The Court of Appeal has held: "A jury trial is guaranteed for legal, as opposed to equitable, issues [citations], and wrongful denial of the right is reversible per se [citation]. Where a case involves both equitable and legal causes of action, the trial court may bifurcate the case to try the equitable issues first, because resolution of the equitable issues may eliminate the need for a trial of the legal causes of action. [Citations.]" (*Golden West Baseball Co. v. City of Anaheim* (1994) 25 Cal.App.4th 11, 50; see *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1238 [same].) Our Supreme Court has held: "It is well established that, in a case involving both legal and equitable issues, the trial court may proceed to try the equitable issues first, without a jury . . . , and that if the court's determination of those issues is also dispositive of the legal issues, nothing further

19

remains to be tried by a jury. [Citations.]" (*Raedeke v. Gibraltar Savings & Loan Assn.* (1974) 10 Cal.3d 665, 671; *Nwosu v. Uba*, *supra*, 122 Cal.App.4th at p. 1238.)

As noted, the damage claims in both the fiduciary duty breach and fraud causes of action are for $425,000. Both claims named as cross-defendants Mr. Werts and Mr. Russ. Both claims arose out of the sale of defendant's shares in World Denim Bar, LLC. The trial court ruled at the conclusion of the bench trial on defendant's fiduciary duty breach cause of action, he failed to demonstrate he sustained any damages. Substantial evidence supports this finding. Mr. Rousseau testified that he performed no due diligence regarding the $425,000 valuation of World Denim Bar, LLC in the letter of intent. Mr. Russ and Mr. Werts testified that a valuation of $425,000 for defendant's World Denim Bar, LLC shares was not serious because the company had produced nothing. The trial court ruled that though Mr. Werts and Mr. Russ breached their fiduciary duties to defendant by the rapid dissolution of World Denim Bar, LLC, no damages were proven. As noted, substantial evidence supports the trial court's finding that no damage was sustained in connection with the fiduciary breach cause of action. Plaintiff does not dispute that substantial evidence supports the no damage finding in connection with his fiduciary duty breach cause of action.

Rather, defendant contends the fiduciary duty breach losses result from a different cause than the fraud claim. Defendant reasons he was entitled to the expense of attempting to secure Mr. Rousseau's approval of the potential sale. However, the damages sought for both the fiduciary duty breach and fraud claims were the same, $425,000. Defendant only alleges a loss of $425,000 because he was unable to sell his membership interest. Defendant's amended fraud cause of action contains no allegations concerning any damage resulting from expenses incurred in negotiating with and attempting to secure Mr. Rousseau's approval. Fraud claims are subject to a specific pleading requirement. (*Robinson Helicopter Co., Inc. v. Dana Corp.* (2004) 34 Cal.4th 979, 993; *Lazar v. Superior Court* (1996) 12 Cal.4th 631, 645.) Thus, the issue of expenses incurred in negotiating with Mr. Rousseau were not properly before the trial court. They cannot serve as a separate basis for a damage claim under the procedural

20

scenario present in this case. Simply stated, defendant's fiduciary duty breach claim for $425,000 in damages was the same losses alleged in his fraud claim. Because these damages were the same, the trial court did not err as to finding no damages for the fraud claim. (See *Nwosu v. Uba*, *supra*, 122 Cal.App.4th at p. 1244 ["The court may decide the equitable issues first, and this decision *may* result in factual and legal findings that effectively dispose of the legal claims."]; accord, *Hoopes v. Dolan* (2008) 168 Cal.App.4th 146, 157.) The trial court properly found the bench trial resolved defendant's fraud claim.

## 2. Damage calculation

Defendant argues there is no evidence he was only entitled to 5 percent of the payment of the royalties actually received by plaintiff. Defendant's argument is largely unintelligible. But, this is how it is articulated in the cross-opening brief: "The April 2003 Agreement states, in pertinent part, that [plaintiff] will receive 'a royalty of 2.05 percent of all wholesale sales in North America' and a 'royalty rate on all sales outside North America' of 4 percent. . . . The next sentence states that [plaintiff] 'has agreed to pay [defendant] a finder's fee of 5% of [plaintiff's] royalty receipts from North America licenses and 15% of [plaintiff's] licensing royalties outside North America, excluding Japan.' . . . . The plain meaning of this provision is that [plaintiff] shall receive a royalty of 2.05 percent of North American wholesale <u>sales</u>, and, in turn [defendant] shall receive 5 percent of that 2.05 percent royalty."

As plaintiff correctly notes, this issue was not raised after the issuance of the tentative statement of decision. Moreover, this precise issue was never raised in the trial court. Thus, we agree with plaintiff this entire issue has been forfeited or, in the alternative, the trial court's findings are deemed supported by sufficient evidence. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133-1134; *Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 59-60; Code Civ. Proc., § 634.)

21

However, even if the issue is properly before us, substantial evidence supports the trial court's interpretation of the ambiguous oral agreement. As noted, the parties conducted themselves in a fashion consistent with the trial court's ultimate conclusions. This constitutes substantial evidence as to the terms of the oral agreement. (*Bohman v. Berg*, *supra*, 54 Cal.2d at p. 796; *Crestview Cemetery Assn. v. Dieden*, *supra*, 54 Cal. 2d at pp. 752-753.) Finally, defendant's argument appears to be that he is entitled to 5 percent of the North American wholesale sales. As best we can determine, defendant is asserting he is entitled to a royalty of 2.05 percent of North American wholesale sales plus 5 percent of that 2.05 percent royalty. However, the ambiguous oral agreement can rationally be read as it was assessed by the trial court. The trial court's resolution of this ambiguity is rational and supported by substantial evidence. (*Lonely Maiden Productions, LLC v. GoldenTree Asset Management, LP* (2011) 201 Cal.App.4th 368, 376-377; *Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1126-1127.)

### 3. The trial court did not abuse its discretion by denying defendant's attorney's fees motion

Defendant contends that under plaintiff's operating agreement , he is entitled to indemnification for his attorney's fees. As noted, defendant claims to have been represented by Mr. Becker during briefly prior to trial and during the attorney fee litigation. Defendant's attorney fee motion was not supported by any declaration nor was plaintiff's opposition. Attorney fee motion orders are reviewed for an abuse of discretion. (*Syers Properties III v. Rankin* (2014) 226 Cal.App.4th 691, 697; *Ellis v. Toshiba America Information Systems, Inc.* (2013) 218 Cal.App.4th 853, 882.)

Defendant reasons he prevailed against plaintiff on its fiduciary duty and contract breach, unjust enrichment and declaratory relief claims against him. Each claim was premised on defendant acting as plaintiff's agent. All four of plaintiff's claims involved defendant's alleged misconduct as its agent. Defendant contends the indemnification

provision is applicable to him because he was required to defend himself against alleged misconduct undertaken in his capacity as plaintiff's agent. Section 12.5 of the operating agreement provides: "To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the LLC for any loss, damage or claim (including reasonable legal fees) incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the LLC and in a manner reasonably within the scope of authority conferred on such Covered Person by this Agreement, except that no Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person (a) by reason of fraud, willful misconduct or gross negligence with respect to such acts or omissions or (b) in breach of the Agreement . . . ." Section 12.6 of the operating agreement provides: "Any person asserting a right to indemnification under Section 12.5 hereof shall so notify the Board of Managers, in writing pursuant to the notice requirements of Section 14.11 hereof. With respect to those claims governed by Section 12.5 hereof, the Board of Managers shall be entitled to control the defense or prosecution of such claim or demand in the name of the indemnified person. The parties hereto shall cooperate in the prosecution or defense against any claims and shall furnish such records, information and testimony and attend such conferences, discovery proceedings, hearings, trials and appeals as may reasonably be requested in connection therewith." Under Section 1.11 of the operating agreement, "'***Covered Person***' means any Member, any Manager, any partners, employees, representatives or agents of any Member or Manager, and any officer, employee, partner, representative or agent of the LLC."

Indemnification is generally applicable to third-party claims, not between the indemnified and the indemnifier. (*Rossmoor Sanitation, Inc. v. Pylon, Inc.* (1975) 13 Cal.3d 622, 628; *Zalkind v. Ceradyne, Inc.* (2011) 194 Cal.App.4th 1010, 1024; *Queen Villas Homeowners Assn. v. TCB Property Management* (2007) 149 Cal.App.4th 1, 5; *Myers Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949, 969.) But the Courts of Appeal have clarified: "Although indemnity generally relates to third party claims, 'this general rule does not apply if the parties to a contract use the term

23

'indemnity' to include direct liability as well as third party liability.' [Citation.]" (*Zalkind v. Ceradyne, Inc.*, *supra*, 194 Cal.App.4th at p. 1024; *Dream Theater, Inc. v. Dream Theater* (2004) 124 Cal.App.4th 547, 555.) The Court of Appeal has held, "When indemnity is expressly provided by contract, the extent of the duty to indemnify must be determined from the contract itself. [Citations.]" (*Zalkind v. Ceradyne, Inc.*, *supra*, 194 Cal.App.4th at p. 1024; see *Rossmoor Sanitation, Inc. v. Pylon, Inc.*, *supra*, 13 Cal.3d at p. 628.) Further, pursuant to Civil Code section 1641, "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (See *Carmona v. Lincoln Millennium Car Wash, Inc.* (2014) 226 Cal.App.4th 74, 81-82.) Code of Civil Procedure section 1858 provides, "[W]here there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all." (See *Picayune Rancheria of Chukchansi Indians v. Brown* (2014) 229 Cal.App.4th 1416, 1428.)

Reading the operating agreement as a whole, the parties never agreed to have direct indemnification occur under these circumstances. The cited portions of the agreement never refer to a right to attorney's fees. And it is extraordinarily unlikely defendant would acquiesce to plaintiff's manager board controlling his defense to its own lawsuit against him. However, such acquiescence to the board's control of his defense would be necessary for him to receive indemnification under the operating agreement. The operating agreement does not provide for direct indemnification as argued by defendant. The indemnification provision in plaintiff's operating agreement does not permit defendant to recover attorney's fees here.

## IV.  DISPOSITION

The judgment is affirmed.  The order denying defendant Harry Haralambus's attorney's fees motion is affirmed.  Defendant, Harry Haralambus, shall recover his costs on appeal from plaintiff, American Rag CIE, LLC.  No costs awarded against or for cross-defendants, Larry Russ and Mark Werts.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

TURNER, P. J.

I concur:

GOODMAN, J. [*]

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Mosk, J., Concurring and Dissenting

I dissent as to the judgment for cross-complainant on an oral contract for royalties. Defendant testified as follows: "It's a long time ago. I don't remember the exact words. But I have a very good recollection of what we discussed. [¶] Mr. Werts said to me, 'you've been a very good friend, you've been a very good confidante, you've given me great advice, you've spent a lot of time with me, this has been going on for a year. I've acted on some of your advice. This has culminated into a very, very good ending for me. I thank you for withdrawing as member of the investment group. I thank you for coming forward and making the commitment to put money up and be a member of the investor group. Thank you for the advice of how we should expand the American Rag business. I thank you for the advice on how we should negotiate the deal with Tarrant in relation to Macy's merchandizing group. Thank you for attending the meetings. Thank you for coming to New York. Thank you for spending all the time with Gerard Guez upstairs at 9000 Sunset. Thank you for reviewing my divorce documents that Howard Rosoff sent. Thank you for reviewing all the tens and possibly hundreds of faxes and e-mails I was getting over the past year. Thank you for having all these breakfasts with me. *For all that work that you've done and for everything that has been performed, your remuneration or payment therefore is going to be the following.*'" (Italics added.)

He added as follows: "Mr. Werts at that time had conversations with me and told me that he wanted to pay me or repay me *for all the work that I had done in the previous year in helping to put all of these pieces of the puzzle together*, namely the buyout, the Macy's deal, the divorce from his wife. [¶] He told me that what would happen was I would get paid a percentage as a finder's fee . . . ." (Italics added.)

1

Later on defendant testified that "this finder's fee and this series of payments were a reward to him." He then specified the payments were paid him for three reasons: his efforts at putting together an investor group; the work he had done in negotiating deals; and the advice he had given regarding the business and divorce, all of which had occurred prior to the promise for payments.

This testimony reflects classic past consideration, which will not result in a binding contract. (1 Witkin, Summary of Cal. Law (10th ed. 2005) Contract, §217, p. 250.) In light of defendant's clear and repeated testimony and arguments, I do not consider his one inconsistent statement that the royalties were a quid pro quo for his not proceeding with buying the wife's interest to be substantial evidence. He had no right to buy that interest anyway.

I acknowledge that inconsistencies in testimony do not require that said testimony be disregarded for purposes of substantial evidence. (*Clemmer v. Hartford Ins. Co.* (1978) 22 Cal.3d 865, 878.) Here, however, the repeated testimony of defendant reflecting that the promise to pay was based on past services renders the one statement using the term quid pro quo either as a misspoken inaccuracy or as a "[t]ransparent prevarication . . . [and] not an acceptable basis for decision. . . . [C]ourts must be diligent not to base an award on testimony tailored by financial expediency rather than by truth." (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 654.)

Accordingly, I would reverse that portion of the judgment. I otherwise would affirm.


MOSK, J.


2