Filed 2/13/26  Botach v. DiVeroli CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| JONATHAN BOTACH, | B342512 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 22STCV16593) |
| v. | |
| ATERET DIVEROLI, in her individual capacity and as CO-EXECUTOR OF THE ESTATE OF YOAV BOTACH, | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Armen Tamzarian, Judge.  Affirmed.

Jonathan Botach, self-represented litigant, for Plaintiff and Appellant.

Gold & Berkus, Justin B. Gold, and Omer A. Khan, for Defendants and Respondents.

## I.     INTRODUCTION

Plaintiff Jonathan Botach appeals from a summary judgment in favor of defendant Ateret DiVeroli on his claims against her individually and in her capacity as co-executor of the estate of plaintiff's brother Yoav[1] Botach (the estate).  We affirm.

## II.     BACKGROUND

This action arises from over a decade of disputes between plaintiff and Yoav.  Plaintiff contends he spent years pursuing payment for debts Yoav owed to him and his siblings.  Plaintiff filed several lawsuits to enforce Yoav's promises and Yoav negotiated settlements with him to end each litigation, but Yoav never paid his debt.  After Yoav's death, plaintiff tried to collect from his estate.

---

[1]     Because many of the persons involved in the dispute are family members who share the same last names, we will refer to them by their first names.  Ateret is Yoav's daughter.

A.    *Plaintiff's Agreements with Yoav*[2]

1.    2010 agreement

In 2008, Yoav's nephew Assaf[3] filed lawsuits against Yoav in Israel.  On May 2, 2010, Yoav agreed to pay plaintiff, who was licensed as a lawyer in Israel, 10 percent of all the money that plaintiff saved Yoav by representing him in the lawsuits (2010 agreement).  According to plaintiff, the last lawsuit was resolved when the last judgment became final on appeal, on November 17, 2019, at which time plaintiff became entitled to $3.4 million, or 10 percent of $34 million.[4]  Yoav never paid plaintiff.

2.    2012 settlement agreement

On October 21, 2012, plaintiff and Yoav entered into a settlement agreement in which Yoav agreed to pay plaintiff $2.6 million to settle plaintiff's claims against him (2012 settlement agreement).  According to plaintiff, the 2012 settlement agreement settled only claims for "his work **in Los Angeles** (not

---

[2]    The facts concerning the agreements involved in this action are taken from the operative first amended complaint.

[3]    Assaf is the son of David, Yoav and plaintiff's brother who died in 1999.

[4]    As discussed later, defendants presented evidence that the Israeli court approved a settlement agreement between Yoav and Assaf in that final lawsuit on September 24, 2017, ending the litigation as to Yoav though the litigation continued against others through appeal.

his work in Israel, which was not yet completed) . . . ." The written agreement attached to the complaint, however, stated that in exchange for $2.6 million in "property only," plaintiff would "DROP ALL COMPLAINTS BOTACH FAMILY, FOREVER PERTAINING TO THIS MATTER)." Yoav breached the settlement agreement by failing to make payment.

### 3. 2015 settlement agreement

On March 31, 2015, plaintiff and Yoav entered into a written settlement agreement in which Yoav agreed to pay plaintiff "$1.5 million . . . on or before September 30, 2015," in exchange for plaintiff's agreement to "dismiss[ ] with prejudice . . . all existing lawsuits against all defendants filed in the state of California in which Yoav . . . was a party" (2015 settlement agreement).[5] Yoav also "promised to give [plaintiff's daughter Abigail a] $50,000 wedding gift . . . [t]hen, sometime in 2016 Yoav orally promised to add $10,000 to Abigail's gift . . ." (2016 oral

---

[5] Plaintiff alleged in his complaint that the 2015 settlement agreement pertained only to his "**personal** claims (not the family's claims, which were settled 2 days prior, and not [the 2010 agreement] for work that was still ongoing[.])" We do not consider plaintiff's reference to his ability to settle "family claims" as he is not a licensed attorney in California and is unable to represent the claims of other individuals in court. (Bus. & Prof. Code, § 6125 ["No person shall practice law in California unless the person is an active licensee of the State Bar"].) "Since the passage of the State Bar Act in 1927, persons may represent their own interests in legal proceedings, but may not represent the interests of another unless they are active members of the State Bar." (*Hansen v. Hansen* (2003) 114 Cal.App.4th 618, 621, citing *Drake v. Superior Court* (1994) 21 Cal.App.4th 1826, 1830.)

4

promise). But Yoav had "repeatedly broken every one of his promises . . . ."

> 4. 2019 settlement agreement

On May 5, 2019, plaintiff and Yoav entered into a settlement agreement in which Yoav "promis[ed] to pay [plaintiff] a sum of $1,250,000 by . . . check number 1401, dated: 5/3/19." In exchange, plaintiff "promise[d] to consider this payment of $1,250,000 as a full and complete payment of all past debts owed by [Yoav] to [plaintiff]" (2019 settlement agreement).[6] Plaintiff also "promise[d] never to sue Yoav in the future for any past or present debts, nor for any kind of claims or demands, not by him, nor by his children Adams Botach, Abigail Botach, or Lior Botach, nor by any other of his future descendants or issues." On May 3, 2019, pursuant to the terms of the 2019 settlement agreement, Yoav wrote plaintiff a check for $1.25 million (2019 check). Yoav instructed plaintiff "to deposit the check in Israel, so that [p]laintiff (and then Yoav) [would not] have to pay 40%

---

[6]    Plaintiff did not attach a copy of the 2019 settlement agreement to his complaint, but defendants submitted a copy of the agreement in support of their motion for summary judgment, on July 24, 2024, 15 days after they had filed their motion, statement of undisputed facts, and supporting evidence. Plaintiff did not seek a continuance of the hearing on the summary judgment motion or raise an evidentiary objection to the 2019 settlement agreement. He nonetheless now contends that defendants' late production of the 2019 settlement agreement should have voided defendants' motion for summary judgment. He does not, however, raise a cogent argument as to why the late production voids summary judgment. We therefore reject plaintiff's contention.

5

tax . . . ." Plaintiff alleged that in July 2019, Ateret cancelled the check by telling her daughter Avigail to put a stop payment on the check.

After the 2019 check was cancelled, Ateret and her siblings told "family, associates, and the general public—that [p]laintiff [was] to blame for [the] cancellation . . . because he did not deposit the check in a bank account in Los Angeles, and instead tried to deposit it in Israel. They further claim[ed] that they would have paid [p]laintiff, had he not sued them."

B. *Plaintiff's Lawsuits Against Yoav*

1. 2011 lawsuit

On October 12, 2011, plaintiff filed a lawsuit (2011 lawsuit) seeking a declaratory judgment against Yoav that the Botach "family is entitled to finally regain our share in the properties— equity and all revenues derived—which Yoav had bought with the money that David sent him during the [1970s] . . . ." On December 12, 2012, plaintiff dismissed the lawsuit.

2. 2014 lawsuit

On April 25, 2014, plaintiff filed a lawsuit (2014 lawsuit) against Yoav for breaching the 2012 settlement agreement. On April 1, 2015, plaintiff dismissed the lawsuit with prejudice.

### 3. 2015 lawsuit

On September 18, 2015, plaintiff filed a lawsuit (2015 lawsuit) seeking to vacate the dismissal of the 2014 lawsuit due to fraud during the settlement negotiations. He also alleged that Yoav breached the 2015 settlement agreement, including the $50,000 promise to plaintiff's daughter. On July 27, 2016, the trial court granted Yoav's anti-SLAPP motion and dismissed the action with prejudice.

### 4. 2016 lawsuit

On August 8, 2016, plaintiff filed a lawsuit (2016 lawsuit) against Yoav alleging breach of the 2012 and 2015 settlement agreements. On January 12, 2017, the trial court in that lawsuit ruled that claims based on the 2012 settlement agreement were barred by the doctrine of res judicata. For claims based on the 2015 settlement agreement, the court abated the action because the 2015 lawsuit, which alleged a breach of the 2015 settlement agreement, was then on appeal. On April 4, 2018, after the appeal was dismissed, the court entered a judgment of dismissal against plaintiff.

### 5. 2021 probate proceedings

On February 4, 2021, plaintiff filed a creditor's claim against the estate for $6,115,000 (2021 probate proceedings). For facts supporting the claim, he wrote: "[On May 2, 2010,] [Yoav] promised [plaintiff] 10% of moneys saved in litigation [amount claimed] 3,515,000" and "[on October 21, 2012,] [Yoav] promised

7

to pay [plaintiff] for his legal services [amount claimed] 2,600,000[.] Attached [are] some of the documents relating to those promises." Plaintiff did not identify the 2015 settlement agreement or the 2019 settlement agreement in his creditor's claim.[7] The estate did not respond to the claim.

6. 2021 lawsuit

On July 12, 2021, plaintiff filed a lawsuit (2021 lawsuit) against Ateret as representative of the estate. He alleged that the estate had rejected his family's separate creditor's claim to return the family wealth. On December 1, 2021, plaintiff filed a first amended complaint in that lawsuit, in which he alleged "'Yoav has repeatedly breached his many promises to return our family's wealth'" and "all of the moneys, antiques, houses, bank accounts, foreign investments, commercial properties and everything else that is deemed today as part of Yoav's estate, in fact belong to our family and not to Yoav's estate.'" On March 11, 2022, the trial court sustained a demurrer to the first amended complaint in the 2021 lawsuit, without leave to amend.

---

[7] Plaintiff attached a copy of the 2012 settlement agreement. In addition, plaintiff attached a copy of the 2015 settlement agreement and the 2019 check as documents relating to the 2010 agreement and the 2012 settlement agreement. He did not, however, attach a copy of the 2019 settlement agreement to his creditor's claim.

## III. PROCEDURAL BACKGROUND

### A. *First Amended Complaint*

On July 11, 2023, plaintiff filed the operative first amended complaint against defendants[8] alleging causes of action for: (1) breach of contract (alleging breaches of the 2010 agreement, the 2012 settlement agreement, the 2015 settlement agreement, the 2016 oral promise, and the 2019 settlement agreement); (2) "intentional intervention" in contractual relationship (intentional interference claim); (3) declaratory relief; (4) defamation; (5) intentional infliction of emotional distress; and (6) punitive damages.

### B. *Summary Judgment Motion*

On July 9, 2024, defendants filed a motion for summary judgment, in which they argued, among other things, that plaintiff's claims were barred by the doctrine of res judicata.[9]

---

[8]     As noted, defendants are Ateret, as an individual, and Ateret as co-executor of the estate.

[9]     The trial court took judicial notice of 17 documents, 15 of which were court records in plaintiff's prior lawsuits against Yoav and the estate: *Jonathan Botach v. Barkochba Botach, et al.,* L.A. Super. Ct. No. BC471397; *Jonathan Botach v. Yoav Botach, et al.,* L.A. Super. Ct. No. BC543788; *Jonathan Botach v. Yoav Botach,* L.A. Super. Ct. No. BC595051; *Jonathan Botach v. Yoav Botach,* L.A. Super. Ct. No. BC629796; and *Jonathan Botach v. Ateret DiVeroli,* L.A. Super. Ct. No. 21STCV25493.  One was the plaintiff's creditor's claim filed in *Estate of Yoav Botach,*

Specifically, they contended that plaintiff's claims that Yoav breached the 2012, 2015, and 2019 settlement agreements were previously litigated over the course of the 2014, 2015, 2016, and 2021 lawsuits.

Defendants also argued that plaintiff's claims against the estate were barred by Code of Civil Procedure section 366.2[10], which requires an action against a decedent's estate be filed within one year after the date of death. Defendants acknowledged that the statute of limitations is tolled while a creditor's claim for the same alleged debt is pending (Prob. Code, § 9352) but supported their limitations defense with the following undisputed facts: Yoav died on May 23, 2020; and on February 4, 2021, plaintiff filed a creditor's claim against the estate for $6,115,000 for promises made in the 2010 agreement and 2012 settlement agreement.[11]

On the intentional interference claim, defendants submitted evidence that Ateret never instructed her daughter Avigail to stop payment on the 2019 check. They offered the declaration of Ateret stating, "I did not cancel the check or order my daughter to cancel the check. And I did not instruct Yoav's bank in Los Angeles not to respond to [plaintiff's] bank in Israel about payment."

---

L.A. Super. Ct. No. 20STPB04880. One was a copy of a search of the California State Bar Attorney website showing that plaintiff is not licensed to practice law in California.

[10] All further statutory references are to the Code of Civil Procedure, unless otherwise indicated.

[11] The trial court took judicial notice of plaintiff's creditor's claim.

On the intentional infliction claim, defendants argued that plaintiff could not satisfy the element of extreme and outrageous conduct because he was alleging a mere breach of contract, which is not a recognized basis for this tort claim. Defendants offered the undisputed facts that "[p]laintiff's purported emotional distress is due to Yoav's breaches of contracts, which "'forced [plaintiff] to live a poor and miserable life'" and "[Ateret's] alleged breach of promise to pay the 2019 [c]heck on behalf of Yoav's Estate 'caused [plaintiff] immeasurable plain and suffering.'"

Finally, on the defamation claim against Ateret personally, defendants argued that plaintiff could not meet the elements of publication, falsity, or defamatory nature. As to Ateret's alleged statement that plaintiff was "to blame for cancellation of the check, because he did not deposit the check in a bank account in Los Angeles, and instead tried to deposit it in Israel," defendants noted that plaintiff had not identified a specific conversation or a third party who heard the allegedly defamatory statement. Further, defendants set forth the following undisputed facts: "Plaintiff took the 2019 [c]heck to deposit it in Yoav's bank in Los Angeles. The banker at Yoav's bank told [p]laintiff that if [p]laintiff deposited the 2019 [c]heck there, [p]laintiff 'would have a huge amount of tax.' [¶] . . . [¶] Yoav's [c]ertified [p]ublic [a]ccountant . . . also confirmed that [p]laintiff would be responsible for a heavy tax if he deposited the 2019 [c]heck at Yoav's bank in Los Angeles." They also noted it was undisputed that plaintiff took the check to Israel and "Yoav's bank in Los Angeles did not transfer the funds under the 2019 [c]heck to Israel upon the Israeli bank's request." Thus, according to defendants, plaintiff could not demonstrate, as a matter of law, that Ateret's alleged statement was false.

Next, defendants argued that plaintiff could not demonstrate that Ateret's alleged statement that defendants "would have paid [p]laintiff, had he not sued them" was defamatory. Defendants argued that this alleged statement related only to Ateret's state of mind, was predictive in nature, and did not reflect on the character of plaintiff. Therefore, the statement was not defamatory as a matter of law.

C.     *Opposition to Motion*

On September 11, 2024, plaintiff filed his opposition to the motion for summary judgment. As relevant here, he argued that the doctrine of res judicata did not apply to his claims for breach of the 2010 agreement or the 2019 settlement agreement, which he claimed had never been litigated. In support of his opposition, plaintiff submitted a declaration in which he stated that, "[i]n the [2021] probate proceedings that [*sic*] I did not sue anything that is owed to me, I tried, and failed, to demand payment to my family, not to me." He also submitted a tentative ruling of the probate court sustaining the demurrer to plaintiff's first amended complaint in the 2021 lawsuit, without leave to amend. That tentative ruling, which was not adopted in the final judgment, stated that the court was sustaining the demurrer based on the jurisdictional defect of standing and the pleading defect of lack of certainty.

In support of his intentional interference claim, plaintiff submitted his own declaration, stating, "[Ateret] ordered her daughter A[v]igail Di[V]eroli, whom she sent from FL to live in Yoav's house in LA, to cancel the $1.25m check that Yoav gave me in 2019."

12

Plaintiff maintained that there were disputed issues of fact, requiring "evidence and testimony" as to whether Ateret's conduct—alleged to include defamation, as well as contractual interference and willful refusal to pay—constituted intentional infliction of emotional distress. He noted that defendants did not deny that Ateret made the allegedly defamatory statements.

D.    *Ruling on Motion*

On September 23, 2024, the trial court granted defendants' summary judgment motion. The court found that the breach of contract claim, the intentional interference claim, and the declaratory relief claim were barred by the doctrine of res judicata.

The trial court agreed that Ateret was entitled to summary judgment on the defamation claim because there were no disputed facts and plaintiff had not shown that the statements were false or defamatory. Specifically, plaintiff admitted he did not deposit the 2019 check in a bank in Los Angeles because he was told he would incur a significant tax burden if he did so. The other allegedly defamatory statements regarding whether "plaintiff is to blame" or defendant "would have paid [p]laintiff, had he not sued them" could not be defamatory because they were not statements of fact and they did not constitute a "'publication that exposes the plaintiff to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation.'"

In addition, the trial court concluded Ateret was entitled to summary judgment on plaintiff's claim for intentional infliction of

13

emotional distress because plaintiff could not prove extreme and outrageous conduct by repeating his contract claims and deficient defamation claims.

Finally, as to the claim for punitive damages, the trial court explained that a request for punitive damages was not an independent cause of action; it was a remedy. Because the court granted defendants summary judgment, the court ruled plaintiff was not entitled to punitive damages.

## IV.   DISCUSSION

A.   *Standard of Review*

"A trial court properly grants summary judgment where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law. ( . . . § 437c, subd. (c).) We review the trial court's decision de novo, considering all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports. [Citation.]" (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476.) "We exercise our independent judgment as to the legal effect of the undisputed facts [citation] and must affirm on any ground supported by the record." (*Jimenez v. County of Los Angeles* (2005) 130 Cal.App.4th 133, 140.)

"[F]rom commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law. . . . There is a triable issue of material fact if, and only if, the evidence would allow a

14

reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, fns. omitted.) "The court may not weigh the plaintiff's evidence or inference against the defendants' as though it were sitting as the trier of fact." (*Id*. at p. 856.)

B.    *Legal Principles*

1.    Claims Against a Decedent

Under section 366.2, subdivision (a), a cause of action against a decedent that existed at the time of death, "whether accrued or not accrued," must be initiated no later than one year after death. (§ 366.2, subd. (a); Prob. Code, § 9000 (a)(1); see *Bradley v. Breen* (1999) 73 Cal.App.4th 798, 800.) "An action may not be commenced against a decedent's personal representative on a cause of action against the decedent unless a claim is first filed . . . and the claim is rejected in whole or in part." (Prob. Code, § 9351.) "[T]he filing of a claim tolls the underlying statute of limitations until the creditor's claim has been rejected, and after rejection, '"the creditor has three months within which to bring an action, regardless of the time otherwise remaining on the statute of limitations." [Citations.]' ([*Anderson v. Anderson* (1995) 41 Cal.App.4th 135,] 140.)" (*Estate of Holdaway* (2019) 40 Cal.App.5th 1049, 1056; § 366.2, subd. (b)(2); Prob. Code, §§ 9352, subd. (a), 9353.)

### 2. Res Judicata

Res judicata, now known in California as claim preclusion, requires: (1) the decision in the prior proceeding is final and on the merits; (2) the present action is on the same cause of action as the prior proceeding, or the issue could have been litigated in the prior proceeding; and (3) the parties in the present action or parties in privity with them were parties to the prior proceeding. (*Zevnik v. Superior Court* (2008) 159 Cal.App.4th 76, 82 (*Zevnik*).)

Generally, a dismissal with prejudice is the equivalent of a final judgment on the merits, barring the entire cause of action. (*Boeken v. Philip Morris USA, Inc.* (2010) 48 Cal.4th 788, 793.) This includes a voluntary dismissal with prejudice following a settlement. (*Estate of Redfield* (2011) 193 Cal.App.4th 1526, 1533; Rest.2d of Judgments, § 19, comment b, subd. (a)(1).)

### C. *Analysis*

### 1. Breach of Contract

As noted, plaintiff alleged in the operative complaint that defendants breached the following agreements: the 2010 agreement; the 2012 settlement agreement; the 2015 settlement agreement; the 2016 oral promise; and the 2019 settlement agreement.

It was undisputed that prior to his filing of the operative complaint, plaintiff sued Yoav at least twice for breach of the 2012 settlement agreement and the 2015 settlement agreement. Plaintiff voluntarily dismissed with prejudice the 2014 lawsuit, which alleged a breach of the 2012 settlement agreement; and the

16

court dismissed the 2015 lawsuit, which alleged a breach of the 2015 settlement agreement, after granting Yoav's anti-SLAPP motion. Plaintiff raises no challenge to the trial court's ruling that his breach of contract claims premised on the 2012 settlement agreement and the 2015 settlement agreement are barred by the doctrine of res judicata. (*Zevnik, supra,* 159 Cal.App.4th at p. 82.)

We thus next consider whether defendants were entitled to summary judgment on plaintiff's claim that defendants breached the 2010 agreement. Here, defendants met their initial burden to demonstrate that they were entitled to a judgment in their favor because their obligations under the 2010 agreement—which they claim accrued in September 2017 when the last lawsuit between Yoav and Assaf ended in a settlement agreement—were released by the 2019 settlement agreement, the terms of which stated that plaintiff would consider the $1.25 million "a full and complete payment of all past debts owed by [Yoav] to [plaintiff]" and "promise[d] never to sue Yoav in the future for any past or present debts . . . ." (Civ. Code, § 1541; *Skrbina v. Fleming Cos.* (1996) 45 Cal. App.4th 1353, 1366; compare *Village Northridge Homeowners Assn. v. State Farm Fire & Casualty Co.* (2010) 50 Cal.4th 913, 930 [noting that the law favors settlements and a settlement agreement is considered presumptively valid].)

According to plaintiff, the 2019 settlement agreement did not discharge defendants' obligations under the 2010 agreement because Yoav's obligations under the 2010 agreement did not accrue until November 14, 2019 (after the parties entered into the 2019 settlement agreement), when final judgment was entered in Israel regarding the last remaining party to Assaf's final lawsuit against Yoav. We disagree.

Defendants met their initial burden to show that Yoav's obligation under the 2010 agreement accrued no later than September 24, 2017, when the Israeli court approved a settlement agreement between Yoav and Assaf in that final lawsuit. Defendants offered the declaration of Elad Greiner, Yoav's attorney in the final litigation, to attest to this fact. Plaintiff offered his own declaration attesting to Greiner's bias, but did not meet his burden to demonstrate a material dispute as to the fact. The only copy of the 2010 agreement that is part of the record on appeal is written in Hebrew,[12] and plaintiff does not direct the court to any terms that rebut defendants' proof regarding the obligation's accrual. Nor does he submit Israeli court documents to prove the litigation matters covered by the agreement or when they were resolved. We conclude defendants have met their burden to show that Yoav's debt under the 2010 agreement constituted a "past debt owed" to plaintiff on the date the 2019 settlement agreement was signed and was released by that settlement. Defendants are entitled to summary judgment on the claim for breach of the 2010 agreement.

The claim for breach of the 2019 settlement agreement is barred by the statute of limitations set forth in section 366.2, subdivision (a). Defendants met their burden of showing that plaintiff failed to bring the claim against the estate within one-year of Yoav's death. (§ 366.2, subd. (a).) Plaintiff failed to create a genuine issue of material fact regarding tolling of the statute of limitations because plaintiff agreed that he did not identify the 2019 settlement agreement in his creditor's claim. It being undisputed that there is no basis for tolling under Probate Code

_____

[12]     Neither party provided a certified English translation to aid in our review.

18

section 9352, defendants are entitled to summary judgment on the claim for breach of the 2019 settlement agreement.

Plaintiff also alleged Yoav breached an oral promise made in 2016 to give plaintiff's daughter an additional $10,000 as a wedding gift "as compensation for his repeated failures to keep his promise." In the trial court, defendants contended this was an unenforceable promise because it lacked consideration. Plaintiff did not address defendants' argument regarding the 2016 oral promise but conceded that Yoav's $50,000 gift to Abigail was given out of gratitude for what she had done in encouraging plaintiff to settle with Yoav. An enforceable contract requires consideration. (*Passante v. McWilliam* (1997) 53 Cal. App.4th 1240, 1247.) Past consideration cannot support a contract. (*Ibid.*) Consideration must be bargained for and given in exchange for the promise, not extended for past services rendered. (*Ibid.*) Defendants have met their burden to show that the 2016 oral promise is not an enforceable contract.

### 2.    Intentional Interference Claim

The elements of intentional interference with contractual relations are:  (1) a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of this contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 55.) The tort of intentional interference with contractual relations requires a valid contract between the plaintiff and a third party. (*Ibid.*) Because the estate stands in

the shoes of Yoav, and Yoav was the contracting party, there can be no claim for intentional interference in contractual relations against the estate.

Most of the allegations in plaintiff's intentional interference claim refer to conduct by Yoav's son Bar Kochba, who is not a defendant in the operative first amended complaint. The only allegation that pertained to Ateret individually was that "the 2019 check was cancelled by [d]efendant Ateret Di[V]eroli, who told her daughter Avigail to put a stop payment on the check." (Underscoring omitted.) As we note above, Ateret submitted a declaration denying that she told her daughter to stop payment on the 2019 check. According to plaintiff, defendants should have submitted evidence (a declaration or deposition testimony) from Ateret's daughter Avigail, who could have provided the strongest proof that there was no interference with the check. Plaintiff relies on the principle that "summary judgment may be denied in the discretion of the court if the only proof of a material fact offered in support of the summary judgment is an affidavit or declaration made by an individual who was the sole witness to that fact . . . ." (§ 437c, subd. (e).) But this "rule" is discretionary, and it is not improper to grant summary judgment to the defendants on these facts where plaintiff has offered no evidence that Ateret interfered in his contractual relationship except his accusation.

Ateret is entitled to summary judgment on plaintiff's intentional interference claim.

20

### 3. Declaratory Relief

Defendants have met their burden to show they are entitled to summary judgment on the third cause of action against the estate, which sought a declaration that Yoav owed a debt to the family. In support of this claim, plaintiff alleged Yoav agreed on March 29, 2015, to "return to the family <u>ALL the money</u> that David transferred to him" in the 1970s and requested a declaration that Yoav's commitment was valid and binding, that the family in Israel was entitled to all of Yoav's property in Israel, "including real estate, and moneys in bank accounts" to "compensate the family for at least some of the millions that [Yoav] owed."

This claim is barred by the statute of limitations set forth in section 366.2, subdivision (a). Defendants met their burden to show that plaintiff failed to bring the claim against the estate within one year of Yoav's death. (§ 366.2, subd. (a).) Plaintiff failed to create a genuine issue of material fact regarding tolling of the statute of limitations because plaintiff agreed that "[p]laintiff's [c]reditor's [c]laim identified [only] two agreements as the basis for his claim: (1) the 2010 [a]greement in the amount of $3,515,000, and (2) under the 2012 [settlement a]greement in the amount of $2,600,000, for a total amount of $6,115,000." He did not identify the March 29, 2015, promise to return the family's money. It being undisputed that there is no basis for tolling under Probate Code section 9352, defendants are entitled to summary judgment on the declaratory relief claim on the basis of the statute of limitations.

4.    Defamation

"Defamation is 'a false and unprivileged publication that exposes the plaintiff "to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." (Civ. Code, § 45.)' [Citations.]" (*Nygard, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1047–1048.) The elements of this cause of action are: "'(a) a publication that is (b) false, (c) defamatory, (d) unprivileged, and (e) has a natural tendency to injure or that causes special damage.'" (*Taus v. Loftus* (2007) 40 Cal.4th 683, 720.)

Ateret met her burden to show that she was entitled to summary judgment because plaintiff cannot meet the element of falsity.[13] "In all cases of alleged defamation, whether libel or slander, the truth of the offensive statements or communication is a complete defense against civil liability, regardless of bad faith or malicious purpose. [Citations.] . . . [T]he defendant need not justify the literal truth of every word of the allegedly defamatory matter. It is sufficient if the defendant proves true the *substance* of the charge, irrespective of slight inaccuracy in the details, 'so long as the imputation is substantially true so as to justify the "gist or sting" of the remark.' [Citations.]" (*Smith v. Maldonado* (1999) 72 Cal.App.4th 637, 646–647, fn. omitted.)

As to Ateret's alleged statement that the 2019 check was cancelled because plaintiff did not deposit it in Los Angeles, plaintiff admitted that he did not deposit the 2019 check in a bank in Los Angeles, explaining that he was told he would incur

---

[13]    The defamation cause of action was alleged only against Ateret.

22

a significant tax burden if he did. The distinction that plaintiff draws—that Yoav told him to take the 2019 check to Israel to avoid the tax—is an additional detail about the motive behind his conduct, but it does not make the statement false. The other statements—that plaintiff was to "blame" for the cancellation of the check, and Ateret would have paid plaintiff if he had not sued the estate—are not facts that can be adjudged for falsity. (*Jensen v. Hewlett-Packard Co.* (1993) 14 Cal.App.4th 958, 970 [a statement of opinion cannot be false]; *Cansino v. Bank of America* (2014) 224 Cal.App.4th 1462, 1469 [statements or predictions about future events are opinions].) Plaintiff has failed to show that there is a disputed issue of material fact with respect to falsity.

Ateret is therefore entitled to summary judgment on plaintiff's defamation cause of action.

### 5. Intentional Infliction of Emotional Distress

To prove the tort of intentional infliction of emotional distress, plaintiff must prove: "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1050, internal quotations omitted.) Outrageous conduct is defined as conduct that is "so ""extreme as to exceed all bounds of that usually tolerated in a civilized community.""" (*Id*. at pp. 1050–1051.)

23

Here, plaintiff alleged that defendants' extreme and outrageous conduct comprised of "[d]efendants' defamation against [p]laintiff, [and] their constant intervention in each of the agreements that [p]laintiff has had with Yoav . . . ." As we explain above, defendants were entitled to summary judgment on the defamation claim and thus plaintiff could not demonstrate, as a matter of law, that defendants engaged in the alleged outrageous conduct. Further, breaches of contract are not considered extreme and outrageous conduct as a matter of law. (*Erlich v. Menezes* (1999) 21 Cal.4th 543, 558 (*Erlich*).) Because "the law generally does not distinguish between good and bad motives for breaching a contract" (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 516), merely breaching a contract does not support a tort action. To become tortious, the breach must also violate a duty arising from principles of tort law that is independent of the contract. (*Id.* at p. 515; *Erlich, supra*, 21 Cal.4th at p. 552.)

Defendants are entitled to summary judgment on the intentional infliction of emotional distress cause of action.

### 6. Punitive Damages

Punitive damages are a remedy, not a cause of action. (*Grieves v. Superior Court* (1984) 157 Cal.App.3d 159, 163–164.) Because we grant summary judgment in favor of defendants on all claims, punitive damages are not available to plaintiff.

24

# V.    DISPOSITION

The judgment is affirmed.  Defendants are awarded costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


KIM (D.), J.


We concur:



HOFFSTADT, P. J.



KUMAR, J.*

---

\*    Retired judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.